UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BAYONG BROWN BAYONG and | : | |
| AHMED ADEM | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | JUDGE JEFFERY P. HOPKINS |
| | : | |
| COUNTY OF BUTLER, OHIO; | : | CASE NO. 1:20-cv-989 |
| THE BUTLER COUNTY BOARD OF | : | |
| COMMISSIONERS; BUTLER COUNTY | : | |
| JAIL; CORRECTION OFFICERS | : | |
| A. ROBERTS, L. BROWNING, | : | |
| AND BLANKTON | : | |
| | : | |
| **Defendants.** | : | |

## Expert Report of David A. Caruso

### QUALIFICATIONS

1. My name is David Caruso. I have been actively involved in correctional and jail practices since 1981. I was an active correctional professional for twenty-eight (28) years. In the final year of my active career and since my retirement in September of 2008, I have been involved in correctional/jail practices as a private consultant regarding correctional and jail issues.

2. My education includes a Bachelor of Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island; a Graduate Certificate in Management/Correctional Administration from Salve Regina University in Newport, Rhode Island; a Master of Science Degree in Management and Homeland Security from Salve Regina University in Newport, Rhode Island.

3. From January 2015 through August 2015, I was the Director of Training and Development at Wyatt Detention Facility in Central Falls, Rhode Island. I was responsible for training, development, and delivering all facets of jail and correctional curriculum to both pre-service correctional candidates and continuing in-service education for sworn correctional staff.

4. From 2002 until 2008 I served as a Faculty Member teaching Criminal Justice at Gibbs College in Cranston, Rhode Island. In this capacity I was responsible for undergraduate courses on Constitutional Issues in Law Enforcement; Managing Police Organizations; Contemporary Issues in Corrections; Juvenile Justice; Criminal Law; and Drugs and the Law.

5. From 2008 to 2009 I served as an Adjunct Teacher in the Criminal Justice Department of Lincoln Technical Institute in Lincoln, Rhode Island. In that capacity I was responsible for undergraduate

courses on Contemporary Issues in Corrections; Community Corrections; Parole, Probation and Sentencing; Ethics; Criminal Justice; and Management in Criminal Justice.

6. From 2008 to present I serve as an Adjunct Faculty in the Criminal Justice Department for Salve Regina University in Newport, Rhode Island. In this capacity I am responsible for teaching graduate courses on Corrections.

7. From 2009 to present I serve as a part-time Faculty Member in the Criminal Justice Department of New England Technical Institute in Warwick, Rhode Island. In this capacity I am responsible for courses such as Corrections; Probation, Parole and Sentencing; Gangs and Organized Crime; Contemporary Issues in Corrections; Drugs and the Law; Security; and Criminal Law.

8. In October 2022 I Guest Lectured at Johnson & Wales University in Providence, Rhode Island on Solitary Confinement; Administrative Segregation; and Mental Health in these areas.

9. In December 2020 I presented at a webinar for Legal Liability Risk Management Institute on current Use of Force for over 400 Jail Administrators, Correctional Officers, and Jail Deputies attendees.

10. In July 2018 I attended the American Correctional Association, Continental Congress in Minneapolis, Minnesota.

11. In October 2017 I attended the First Annual Legal Liability Risk Management Conference on the Operations of Jails and Prisons in Cape Coral, Florida.

12. In March 2017 I was a Guest Speaker at the University of Rhode Island in Kingston, Rhode Island regarding Jails and Prison Management.

13. In April 2016 I was a Guest Speaker at the University of Rhode Island in Kingston, Rhode Island regarding Contemporary Issues in Corrections.

14. In October 2014 I was a Guest Speaker at the University of Rhode Island in Kingston, Rhode Island regarding Jail and Prison Operations; Legal Liability Issues; and Best Practices in the Jail and Prison Industry.

15. In 2012 I was a Guest Speaker at the University of Rhode Island in Kingston, Rhode Island on Prison and Jail Operations.

16. In 2011 I was a Guest Speaker for the East Greenwich Police Department in East Greenwich, Rhode Island on Mental Health Awareness in Local Lockups.

17. In 2011 I was a Guest Speaker at Salve Regina University in Newport, Rhode Island on Contemporary Issues in Prisons and Jails.

18. In 2010 I was a Guest Speaker at West Warwick Police Department in West Warwick, Rhode Island on Correctional Overview.

19. In 2009 I was a Guest Speaker at Roger Williams University in Bristol, Rhode Island on Corrections and Jail Management.

20. In 2008 I was a Guest Speaker at Salve Regina University in Newport, Rhode Island on Community Corrections.

21. From 2008 to present I am a member of the Legal and Liability Risk Management Institute in which I conduct jail and prison audits. I also conduct training for jail and corrections personnel throughout the United States.

22. I have co-written a manual for use by jail and correctional officers (*Legal and Liability Risk Management Manual Guide – The Law and Best Practices of Successful Jail/Corrections Operations, 2009*).

23. As a member of the Legal and Liability Risk Management Institute I conduct policy, training, and operations reviews for correctional/jail agencies throughout the United States. These reviews focus on the manner in which agencies treat the critical tasks in correctional and jail operations. As part of these reviews, I assist agencies in identifying areas in policy, training, and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in correctional and jail operations.

24. Since 2008 I have conducted numerous training sessions for public employees. Participants in this training have included correctional and jail officials. I have provided training in the following areas:
    a. Strip Searches
    b. Identification Verification
    c. Classification
    d. Duty to Protect from Assault
    e. Grievances
    f. Medical
    g. Suicide Prevention
    h. Use of Force
    i. Nutrition
    j. Religious Meals/Materials/Worship
    k. Mail
    l. Safety and Security

25. I am a retired Deputy Warden of the Rhode Island Department of Corrections in Cranston, Rhode Island where I served for twenty-eight (28) years before retiring in 2008. During my career with the Rhode Island Department of Corrections, I served in the following capacities: Correctional Officer; Tactical Team Member; Training Instructor for the Department's Academy; Correctional Officer Investigator and Acting Chief; Stress Unit Coordinator; Cell Extractor Commander; Lieutenant at the Medium Security Prison; Lieutenant of the Intake Service Center (state jail system); Captain of the Identification Unit (state jail system); Deputy Warden of High Security; Deputy Warden of Medium Security; Deputy Warden of Medium II Security; and Acting Warden/Deputy Warden of the Intake Service Center (state jail system).

3

26. Since my retirement in September of 2008, I have taught numerous courses on Correctional/Jail Policy and Procedure, Operations, Search, Use of Force, Suicide Prevention, Emergency Management, and Civil Liability for Correctional/Jail Agencies. These courses were presented to participants at various agencies around the United States. Officers in attendance have come from departments with under ten (10) sworn officers to departments with sworn officers numbering in the thousands, including the Cook County Illinois Jail. These programs are conducted numerous times annually throughout the United States.

27. The course on Policy and Procedure focuses on critical tasks in prisons and jails to include Strip Searches; Identification Verification; Classification; Duty to Protect from Assault; Grievances; Medical; Suicide; Use of Force; Nutrition; Religious Meals/Materials/Worship; Mail; as well as Training Issues Relating to Critical Tasks in Corrections and Jails.

28. The program on High-Risk Critical Tasks/Best Practices in prisons and jails includes instructions on Use of Force including inter alia; dealing with individuals of diminished capacity (e.g. suicidal, excited delirium); Custody, Control and Restraint of Prisoners; and Sexual Harassment, Discrimination, and Misconduct.

29. Since 2008 I have been involved in the auditing of correctional/jail operations throughout the United States. I conduct several audits annually based on either an identified need or as a proactive measure of agency performance in the high liability exposure areas of prison and jail operation.

30. My experience, training, and background are more fully described in the attached curriculum vitae which I incorporate by reference to this report.

**MATERIALS REVIEWED**

31. I have reviewed the following materials to date regarding this case:
    1. Plaintiffs' Complaint (Doc. 1)
    2. Defendants' Answer (Doc. 8)
    3. Fourth Amended Calendar Order issued Sept. 26, 2022 (Doc. 27)
    4. Expert Report - Lynn Tramonte" dated December 14, 2020
    5. Susan W. McCampbell Expert Report dated July 11, 2022 and "Preface"
    6. Plaintiff Bayong's July 18, 2022 deposition transcript
    7. Plaintiff Adem's October 17 and 20, 2022 deposition transcripts
    8. "Defendants' Fed. R. Civ. P. 26(a)(l) Initial Disclosures," dated June 11, 2021
    9. Plaintiff's initial disclosures, dated June 11, 2021
    10. Defendants' Responses to Plaintiff Bayong's First Set of Interrogatories, dated December 20, 2021
    11. Defendants' Responses to Plaintiff Adem's First Set of Interrogatories, dated December 20, 2021
    12. Defendants' Responses to Plaintiff Bayong's First Request for Production of Documents, dated December 7, 2021
    13. Defendants' Responses to Plaintiff Bayong's First Set of Requests for Admission, dated December 7, 2021
    14. Defendants' Amended Responses to Plaintiff Bayong's First Set of Requests for Admission, dated December 9, 2021

15. Defendants' Amended Responses to Plaintiff Bayong's First Request for Production of Documents, dated December 9, 2021
16. Defendants' Supplemental Responses to Plaintiff Adem's First Set of Interrogatories, Plaintiff Bayong's First Set of Interrogatories, and Plaintiff Bayong's First Request for Production of Documents, dated January 4, 2022
17. Plaintiff Bayong's jail file contents, history, and screening forms (BS 14-420, 914-949, 952-1277)
18. Plaintiff Adem 's jail file contents, history, and screening forms (BS 421-464, 875-9 l 3, 950-951, 1278-1419)
19. Correspondence regarding Plaintiffs Adem and Bayong (BS 3734-3773)
20. Incident reports involving Plaintiffs Adem and Bayong (BS 465-541)
21. Pass on sheets (BS 871-873)
22. Dr. Floyd memo (BS 1420-1422)
23. Timelines by Butler County Sheriff's Office (BS 1423-1548)
24. Subject management reports - Blanton (BS I 549-174 I, 3861-3863)
25. Subject management reports - Roberts (1742-1807, 2025-2092, 3864-3867)
26. Subject management reports - Browning ( I 808-I 8 I 2)
27. Employee discipline records - Blanton (BS I 813-1837)
28. Employee discipline records - Roberts (BS 1838-1839)
29. Investigation materials (BS 542-545, 1840-2021, 2024)
30. Mory Keita Affidavit (BS 2022-2023)
31. ICE Standards (BS 2097-2833)
32. Training materials (BS 2834-3189, 3190-3 730)
33. Complaint received by ODRC (BS 3731-3733)
34. List of officers and shift assignment sheets (BS 3774-3782)
35. Policies
    a. ICE Use of Force (BS 2854-3855, 3852-3855)
    b. SMO-0 I Use of Force (BS 3790-3791)
    c. SMO-02 Restraint Chair (BS 3792-3813)
    d. SMO-03 Taser (BS 3814-3823)
    e. SMO-04 Restraints (BS 3824-3829)
    f. SMO-05 Subject Management Orders (OS 3830-3836)
    g. SMO-06 Pepperball (OS 3837-3839)
    h. SMO-07 Nova Stun Shield (OS 3840-3842)
    i. SGT-15 Critical Incidents (OS 3843-3847)
    j. SGT-19 Contract Agency Notification (OS 3848-385 I)
    k. HOU-04 Incident Reports (BS 3856-3860)
36. Butler County Jail inmate handbook and COVID protocols
37. Plaintiff's Motion for Leave to File Amended Complaint and proposed First Amended Complaint

32. This expert report is based upon the materials provided to this date and my January 9, 2023 in-person visit to the Butler County Jail. The opinions presented in this report are based upon my specialized experience, my training on and knowledge of jail and correctional practices, as well as my continued research and work with jails and corrections nationally. This work includes conducting training for jail and corrections personnel and auditing the policies and operations of corrections and jail agencies around the United States. My opinions are provided with a reasonable degree of professional certainty within the fields of Corrections and Jails;

5

Correctional and Jail Activities; and Correctional and Jail Administration and Supervision. I am familiar with Prison/Jail Civil Litigation and am familiar with the normal phases of discovery. With this in mind, I recognize that there may be additional documentation developed as the case progresses. In the event that additional material is produced, I will supplement this report.

33. At the onset it is important to note that this report is based upon the facts as presented through the material provided and my January 9, 2023 in-person visit to the Butler County Jail and specifically avoids drawing conclusions based upon credibility issues of the parties.

**FACTS**

34. The events giving rise to this litigation involve two Immigration and Custom Enforcement (I.C.E.) detainees, Bayong, Bayong Brown and Adem, Ahmed at the Butler County Jail, 705 Hanover Street, Hamilton, Ohio. Mr. Bayong's birthdate is December 2, 1968 and Mr. Adem's birthdate is January 1, 1987.

35. Based on the materials reviewed, both Mr. Bayong and Mr. Adem were very disruptive during their stays at the Butler County Jail and displayed a pattern of disobeying lawful orders given by jail staff. For Mr. Bayong, these disruptions included refusal to open his mouth so staff can be sure he swallowed his medication, refusal to wear his protective mask after being warned several times for his safety and that of others during a pandemic, refusal to move to serve his 5-day isolation and, in doing so, tensing his arm up while being escorted and dropping his body weight on the stairs, then accusing staff of pushing him down. (Incident Reports, Bates 518, 521, 523; Jail File, Bates 21; Bayong Depo pg 43) [1]

36. On October 20, 2020 during the COVID pandemic, Mr. Bayong complained of symptoms of COVID, like a sore throat and difficulty swallowing, while he was sharing a cell with Mr. Adem. (Bates 133, 138-139). Mr. Bayong was seen during sick call, and it was noted by medical that Mr. Bayong's "tonsils are red and swollen" with a fever so the medical department determined Mr. Bayong and Mr. Adem needed to be placed in a two-week medical isolation. (Bayong Depo pg 63-64; Bates 129-130, 133, 136). Corrections Officer Crowley attempted to transfer Mr. Bayong and Mr. Adem to H-Pod for the medical isolation, per the medical order, but Mr. Bayong and Mr. Adem refused the officer's direct, lawful orders to pack their belongings. (Incident Report, Bates 534). Mr. Bayong and Mr. Adem admit they did not immediately comply with the orders and instead the officer's orders were questioned. (Bayong Depo pg 126; Adem Depo pg 35-36). Because the detainees were disregarding officer orders, Corrections Officer Crowley called for assistance. One of the responding officers was Corrections Officer Roberts, who issued additional verbal commends to the detainees to pack their belongings, which Mr. Bayong and Mr. Adem refused. (Incident Report, Bates 532). According to jail documents, Mr. Bayong refused Corrections Officer Roberts's orders "and raised his hands as if he was going to strike" Corrections Officer Roberts. To protect himself from being assaulted, Corrections Officer

---

[1] Mr. Bayong testified at deposition that he does not have "any recollection of any corrections officers" when he fell down the stairs and "can't really remember" the event. (Bayong Depo pg 47-48, 51). A medic assessed Mr. Bayong after the fall, reporting a "small abrasion to the top of the shin, no bleeding, no deformities or swelling" and Mr. Bayong was "ambulatory." Mr. Bayong was also "very argumentative with medical, and would not let medical talk and kept questioning medical credentials." (Bates 209). Mr. Bayong admitted he told the Medic to "just leave me alone." (Bayong Depo pg 124).

Roberts "delivered closed fist reactionary strikes" in self-defense, Mr. Bayong was redirected to the floor with the help of Corrections Officer Bartlett, and handcuffed. Mr. Bayong continued to be verbally aggressive but was assessed by a Medic who cleared Mr. Bayong of any significant injuries. (Incident Report, Bates 532; Bates 124). Mr. Bayong was then transferred to medical isolation.

37. Since Mr. Adem shared a cell with Mr. Bayong who was experiencing COVID symptoms, Mr. Adem was ordered into medical isolation by the medical department. (See Bates 1362). The above paragraph describes Mr. Adem's refusal to comply with the multiple officer commands to pack his belongings. Mr. Adem stated in his deposition that he was demanding to speak with a supervisor instead of following orders. (Adem Depo pg 36). Per jail documents, when Corrections Officer Blanton approached Mr. Adem, the detainee smacked the officer's hand away. (Incident Report, Bates 503). Due to the safety threat, Corrections Officer Blanton "performed a takedown to gain control of inmate Adem and he began to follow orders at that point." No further force was used. Mr. Adem was cleared by the Medic and transferred to medical isolation. (Use of Force Review, Bates 506; Bates 1364).

38. Mr. Adem was also a threat to safety and a disruption to facility operations on July 21, 2020, while engaged in the booking-in process. Mr. Adem demanded to be fed (Adem Depo pg 16-17), used obscenities, and threatened staff all while in a holding cell with other inmates. (Use of Force Review, Bates 466-467). It was explained to Mr. Adem that "dinner chow would be in an hour and a half," but Mr. Adem "began mule kicking the door screaming attempting to incite other inmates. (Use of Force Review, 467). In an attempt to de-escalate the situation and prevent other inmates from also being persuaded to become disruptive, Corrections Officer Washburn removed Mr. Adem from the holding cell. Mr. Adem was "escorted to the shower room to be removed from other inmates and to continue the booking process so that he could be moved down the hallway and placed in general population." (Use of Force Review, Bates, 466). The incident reports document that Mr. Adem struck Corrections Officer Washburn in the face and grabbed the officer's leg in an attempt to take him to the ground. Corrections Officer Washburn used force in self-defense and gave Mr. Adem direct orders to place his hands behind his back and stop resisting. Mr. Adem then complied and was cleared by the Medic of significant injury after Mr. Adem "refused to allow medical to eval. further." (Use of Force Review, Bates 466-467; Bates 1281).

39. Mr. Adem's noncompliant, disruptive, and aggressive pattern was seen on August 18, 2020 as well when Mr. Adem failed to return to his cell at the end of his recreation period. Mr. Adem became verbally abusive toward staff. Mr. Adem was written up and received ten days pending future behavior. (Incident Report, Bates 494-496).

## OPINIONS

40. It is my professional opinion based upon my specialized training, background and education as well as my continued research, auditing, training and consulting on jail and correctional practices nationwide that all detainees, whether post-conviction inmates, pre-trial detainees, or ICE detainees, must follow written rules outlined in inmate handbooks and any lawful, verbal communication by officers. Failure to follow written rules or officer commands may result in disciplinary action and presents a threat to the safety of officers and/or inmates as well as a

threat to institutional security. (Butler County Detainee Handbook) (Generally Accepted Correctional Practices) (NDS 2.3, Facility Security & Control, ICE).

41. It is my professional opinion based upon my specialized training, background and education as well as my continued research, auditing, training and consulting on jail and correctional practices nationwide that is it imperative to control and contain disruptive detainees. In the jail setting, moving disruptive, aggressive, and/or noncompliant detainees to an isolated area is the best way to prevent the incitement of other inmates. Isolating disruptive, aggressive, and/or noncompliant detainees assists in keeping order and maintaining the smooth operations of the correctional facility. (Generally Accepted Correctional Practices) (Butler County Sheriff's Office Post Orders "Use of Force ICE 14," Bates 3852-3855). It falls within generally accepted correctional practices to prohibit inmates from making unnecessary noise, such as arguing, shouting, kicking doors, and pounding on walls, doors, windows, etc. In fact, every correctional facility I have worked at, audited, or visited maintained strong rules against inmates arguing, shouting, kicking doors, etc. and, if an inmate violated the rules, discipline would result. Similarly, it falls within generally accepted correctional practices to prohibit inmates from using vulgarities toward officers because respectful behavior is integral to institutional security and the safety of officers and inmates alike. Based on my January 9, 2023 visit to the Butler County Jail, the jail's booking area is a high-traffic area, where inmates are nearly constantly moving in and out and multiple inmates are being held. A disruptive, aggressive, and/or otherwise noncompliant detainee in the Butler County Jail's booking area is exceptionally dangerous to safety and security for a number of reasons, including, but not limited to, the following:

    a. the many inmates who will witness and potentially be incited by the misconduct;

    b. the new or more vulnerable inmates being held in the booking area who may be more sensitive or impressionable; and

    c. the booking, transport, and sometimes medical tasks that jail staff cannot be distracted from.

42. It is my professional opinion based upon my specialized training, background and education as well as my continued research, auditing, training and consulting on jail and correctional practices nationwide that it is dangerous for a detainee in a correctional facility to question the lawful orders of officers, especially when done in front of another inmate(s). A detainee who questions the lawful orders of officers or demands to speak with a higher-ranking officer instead of complying with the lawful orders is effectively disobeying and resisting. Such conduct presents a real threat to institutional security, as normal facility operations are disturbed, and can lead to significant risks to officer and/or inmate safety. It falls within generally accepted correctional practices to prohibit inmates disobeying direct orders given by jail staff. In fact, every correctional facility I have worked at, audited, or visited maintained strong rules against inmates disobeying direct orders and, if an inmate violated the rules, discipline would result. The National Detention Standards also point out that officers and detainees must be protected "from harm by ensuring that facility security is maintained and that events which may pose a risk of harm are prevented." (NDS 2.3(I), Facility Security & Control ICE)

43. It is my professional opinion based upon my specialized training, background and education as well as my continued research, auditing, training and consulting on jail and correctional practices nationwide that policy and procedures between Immigration Customs Enforcement (ICE) detainees and state detainees mirror each other in operational performances such as use of force and detainee rules and regulations. All detainees must follow lawful orders. Failure to

follow lawful orders may result in disciplinary action or the use of force in staff self-defense or to overcome facility disruption or meet any legitimate correctional objective. (Butler County Sheriff's Office Post Orders "Use of Force ICE 14") (Butler County Sheriff's Office Post Orders "Use of Force 2.8") (NDS 2.8, Use of Force ICE) (Ohio Admin. Code Chapter 5120).

44. It is my opinion within a reasonable degree of professional certainty based upon the materials reviewed and my education, training, and experience that Butler County Jail detainees have several procedures to communicate with jail staff, medical staff, lawyers, the court system, family, and Immigration Custom Enforcement. These available procedures involve the Detainee Grievance Procedure, telephone, written correspondence, and internal requests. These available procedures can be followed if a detainee does not agree with an officer. (NDS 2.10, Staff/Detainee Communication ICE) (Performance Based Standards for Adult Local Detention Facilities 4th Ed, pg 86-88 Sec B., pg 99-100 Part 6, pg 101 Section B).

45. It is my opinion within a reasonable degree of professional certainty based upon the materials reviewed and my education, training, and experience that the order to move Mr. Bayong because of his complaint of a sore throat plus presence of fever, which are symptoms of COVID, to isolation is not only procedure but it is also for the safety of staff and detainees alike. The same is true for Mr. Bayong's cellmate, Mr. Adem, even though he was not reporting symptoms at the time. It is extremely important to contain the infected detainees as well as any potentially infected detainees during a pandemic or any imminent health hazard, particularly in an institutional setting. (Generally Accepted Correctional Practices) (Butler County Sheriff's Office Classification of Isolated Inmates D-b) (Butler County Sheriff's Office Medical Services Division's COVID 19 Response)

46. It is my opinion within a reasonable degree of professional certainty based upon the materials reviewed and my education, training, and experience that correctional staff may use reasonable force to protect themselves in a self-defense situation. If staff assessment of a situation leads them to believe they may be assaulted, they do not have to wait to actually be assaulted to react with reasonable force. Correctional staff may use reasonable force to bring a situation under control or to carry out any legitimate correctional objective. (Generally Accepted Correctional Practices) (Performance Based Standards for Adult Local Detention Facilities, 4th Ed, pg 32, 4 ALDF-2B-01) (REF 3-ALDF-3A-30 and 3A-31) (Butler County Sheriff's Office Post Orders "Use of Force ICE 14"). The National Detention Standards define "force" as "the physical actions necessary to overcome resistance, to gain control, contain or restrain a detainee" and permit force when used to "gain control of the detainee; to protect and ensure the safety of the detainees, staff, and others; to prevent serious property damage; and to ensure the security and orderly operation of the facility." (NDS 2.8, Use of Force ICE) (Butler County Sheriff's Office Post Order Use of Force ICE 14). For example, the July 21 and October 20, 2021 uses of force presented in the case would fall under the immediate use of force category and were made in officer self-defense. (NDS 2.8(II)(B)(2), Use of Force ICE) (Butler County Sheriff's Office Post Orders "Use of Force ICE 14"). No use of force in this case was used as a form of inmate discipline.

47. It is my opinion within a reasonable degree of professional certainty based upon the materials reviewed and my education, training, and experience that Butler County Jail's polices and procedures meet or exceed national standards, to include the American Correctional Association, in all areas directly related to this case. At the time of Mr. Bayong's and Mr. Adem's

detentions, the Butler County Jail was complying with the Federal National Detention Standards, as confirmed by the ICE inspections performed at the Butler County Jail. (See also Ohio Minimum Jail Standards and Bates 3731-3733).

48. It is my opinion within a reasonable degree of professional certainty based upon the materials reviewed and my education, training, and experience that the Butler County Jail staff involved in this case met or exceeded training that is currently being given to jail professionals throughout the United States. (See Bates 2834-3730) (NDS 2.8(II)(L), Use of Force ICE) (Ohio Admin. Code 5120:1-8-18). Important to this case, the corrections officers complete an annual use of force review.

49. It is my professional opinion based upon my specialized training, background and education as well as my continued research, auditing, training and consulting on jail and correctional practices nationwide that during my visit to the Butler County Jail I found overall the jail in good, working order. I also found that the policies and procedures were being followed in a manner which met or exceeded Ohio's Minimum Jail Standards and contemporary correctional practices.

50. It is my professional opinion based upon my specialized training, background and education as well as my continued research, auditing, training and consulting on jail and correctional practices nationwide that the materials I have reviewed in this case show that Corrections Officers Roberts, Browning, and Blanton responded appropriately and within generally accepted correctional practices when faced with the noncompliant and disruptive detainees. (See Bates 465-493, 503-517, 526-541, 3731-3733) (Generally Accepted Correctional Practices) (Performance Based Standards for Adult Local Detention Facilities, 4th Edition ACA pg 39 4-ALDF-3A-01) (REF. 3-ALDF-3C-01 AND 02) (4-ALDF-3-A-02) (4 ALDF-2B-01) (REF 3-ALDF-3A-30 and 3A-31) (NDS 2.3(I) and 2.8, Facility Security & Control and Use of Force ICE) (Ohio Admin Code Chapter 5120) (Butler County Sheriff's Office Post Order Use of Force ICE 14) (Butler County Sheriff's Office Classification of Isolated Inmates D-b).

51. It is my opinion within a reasonable degree of professional certainty based upon the materials reviewed and my education, training, and experience that the Butler County Jail staff met the standard of care in the corrections field and took appropriate steps to maintain and protect institutional security as well as Mr. Bayong and Mr. Adem from any known, substantial risks to the detainees' health and safety.

**EXPERT REBUTTAL OF DAVID A. CARUSO ON EXPERT REPORTS OF LYNN TRAMONTE AND SUSAN W. McCAMPBELL**

52. It is difficult to fully address all the parts of the "Expert Report" of Lynn Tramonte, dated December 14, 2020 and "Expert Report" of Susan W. McCampbell, dated July 11, 2022, I disagree with because neither report is focused on the specifics of this case. Neither report cites to the record of this case, and both reports seem to offer opinions about the treatment of other inmates who are not a party to this case.

53. To the extent that Ms. Tramonte reviewed "reports that officials at the Butler County Jail have exercised excessive force, even physically beating detainees, as well as racial and religious discrimination" that are not part of the discovery materials I have been provided, I request the

opportunity to review such reports and supplement my opinions herein. (Tramonte Rpt., pg 3-4). Ms. Tramonte's report also makes assertions easily disproven by the case materials. For example, Ms. Tramonte suggests that Mr. Bayong and Mr. Adem did not receive medical attention after the October 20, 2020 use of force despite the medical records of the care. (Bates 124, 1364; see Bates 503-506, 526-527, 530).

54. Ms. Tramonte also says, "One detainee lost a tooth from the beating," who she presumably means is Mr. Bayong. (Tramonte Rpt., pg 6). Mr. Bayong, himself, admits that he did not lose a tooth, and Plaintiffs seek to amend their Complaint to remove the allegations of a lost tooth. (Bayong Amended Admissions #8 and 12; Bayong Depo pg 94; see Bates 1420-1422).

55. I will not address the parts of Ms. Tramonte's report covering the detainees' "right to work" and the alleged "lack of access to immigration forms, pens, photocopying, medical records needed for immigration cases, and property; gross medical neglect; [and] confinement to a cell with no outside view on average of 20 hours per day and no real outdoor recreation; unacceptable meals of poor nutritional value; coercion and lies from ICE officers attempting to get detainees to agree to deportation." (Tramonte Rpt., pg 9-11 and Exhibit B, E, and F letters). These parts of Ms. Tramonte's report are unrelated to Plaintiffs' Complaint or any of the factual allegations in this case.

56. The "Preface re: Susan McCampbell Expert Report" indicates that only Ms. McCampbell's opinions on "*Monell* liability at Butler County Jail" are being used in this case, but nothing identifies the specific opinions within the 70-page report that are at issue here. In doing my best to rebut the opinions of Ms. McCampbell expressed in another case that might possibly be transferred to this case, I disagree with the idea that the Butler County Jail acts "inconsistent with accepted correctional practices and Ohio Minimum Jail Standards." (McCampbell Rpt., pg 4; sec pg 61, 63). I also disagree with the idea that officers at the Butler County Jail are not equipped with sufficient tools and/or guidance to prevent the use of excessive force. (McCampbcll Rpt., pg 13, 15-16, 18, 24-25, 41, 61-62). As I opined above, the Butler County Jail's policies are consistent with Ohio's Minimum Jail Standards and generally accepted correctional practices. When ICE detainees were held at the Butler County Jail, the jail complied with the National Detention Standards and passed ICE inspections.

57. I strongly disagree with Ms. McCampbell's belief that there is an "out-of-control number of uses of force" at the Butler County Jail. Based on upon my specialized training, background and education as well as my continued research, auditing, training and consulting on jail and correctional practices nationwide, the Butler County Jail does not experience an abnormally high number of uses of force by officers for a facility of its size. There are a few factors that play into the appropriateness of a facility's number of uses of force, most notably the size of the facility and the type of inmates being held. I further disagree with the opinion that "Uses of force are often ... the result of system failures." (McCampbell Rpt., pg 14, 29-30; sec pg 38-41). The misconduct, crimes, and aggressiveness of inmates typically requires some use of force to maintain institutional security and the safety of officers and/or inmates. The red flag system Ms. McCampbell describes at page 30 is not required by the Ohio Minimum Jail Standards, ACA, etc.

58. I disagree with Ms. McCampbell's position that "Butler County Sheriff's Office policies and procedures governing training are inadequate." (McCampbell Rpt., pg 57; see pg 60, 62). As I opined above, the Butler County Jail staff involved in this case met or exceeded training that is

currently being given to jail professionals throughout the United States. I also disagree with Ms. McCampbell's position "That Butler County adopted, enforced, and acquiesced in policies, customs and jail practices, and inadequate supervision and training for jail staff." (McCampbell Rpt., pg 63).

59. At this stage, I do not know if I will be asked to review additional documents. Should I be asked to review additional documents, I will be prepared to render additional opinions or supplement the opinions stated within this report.

60. I do not yet know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool, I will ensure that they are made available for review, if requested, prior to their use.

61. My fees for these professional services are outlined in the attached retainer agreement.

These opinions are made with a reasonable degree of professional certainty. Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury, on this 13th day of January, 2023 in Cranston, Rhode Island, that the foregoing is a true and accurate statement of my opinions in this case.

**DAVID A. CARUSO**