Exhibit 7

**Preface re: Susan McCampbell Expert Report**

Attached is an expert report that our firm is using in another case against Butler County Jail. The purpose of the expert report is to assist in proving *Monell* liability. The basis for *Monell* liability at Butler County Jail, due to a custom of improper supervision, excessive force, and cruel and unusual punishment remains the same.

**Susan W. McCampbell**
**Expert Report**
**Mauricio Benty v. County of Butler,** *et. al.*
**Case No. 1:21-cv-00364**
**July 11, 2022**

<u>**Table of Contents**</u>         <u>**Page**</u>

| | | |
|---|---|---|
| I. | Scope of Report | 2 |
| II. | McCampbell Background and Qualifications | 4 |
| III. | The Butler County Jail (BCJ) | 8 |
| IV. | Governance of Correctional Practice | |
| | A. Policies and Procedures in Jail Operations | 10 |
| | B. Ohio Minimum Jail Standards and the Butler County Jail's Compliance | 14 |
| | C. Butler County's Obligations Regarding Jail Oversight | 17 |
| | D. Critical Shortfalls - Jail Policies and Procedures and Impact on Mr. Benty | 18 |
| |     i. Example – Inmate Disciplinary Procedures and Impact on Mr. Benty | 19 |
| V. | Use of Force Policy(ies) – Butler County Jail (BCJ) | 24 |
| VI. | Use of Force and Injury to Mr. Benty | |
| | A. Use of Force | 28 |
| | B. How Many Uses of Force Are Too Many Uses of Force? | 29 |
| | C. Review of Mr. Benty's Medical Documentation | 31 |
| | D. Thurkill's and Morgan's Actions | 32 |
| | E. Allegations of Racial Slurs, Intentional Infliction of Emotional Distress, Aiding and Abetting Unlaws Race-Based Discrimination | 35 |
| | F. Care of Inmates with Mental Illness | 36 |
| VII. | Investigation of Use of Force in the Butler County Jail and the Investigation Involving the Use of Force and Mr. Benty | 38 |
| VIII. | Employees' Personnel Files, History of Employment | |
| | A. Thurkill's Employment History and Uses of Force | 44 |
| | B. Morgan's Employment History and Uses of Force | 53 |
| IX. | Employee Training and Training Records of Thurkill and Morgan | 57 |
| X. | Findings | |
| | A. Butler County Jail Policies and Procedures | 61 |
| | B. Practices, Investigations, Outcomes | 61 |
| | C. Training | 62 |
| XI. | Conclusions | 62 |

<u>Attachments</u>

| | | |
|---|---|---|
| 1 | Exhibits/Materials Reviewed | 64 |
| 2 | McCampbell CV; Rule 26 (a)(2)(B)(v) Disclosure | 71 |

## I.    Scope of Report

This expert report examines the conditions and practices tolerated and condoned by Butler County, Ohio, and the Butler County, Ohio, Sheriff's Office (and the Butler County Jail – BCJ) that resulted in a jail in which operations were arbitrary and capricious, and where an inmate, Mr. Mauricio Benty came to be assaulted by corrections officers, for no legitimate objective reason, in violation of policy, and with no credible investigation, or disciplinary outcomes evidenced.

To prepare this report I reviewed and relied on pleadings filed in the case, the parties' discovery responses, documents produced by Butler County, Ohio, and by plaintiff Mauricio Benty, and transcripts of the parties' depositions.  Additional materials used in the preparation of this report and findings are noted in Attachment 1.

In summary, the complainant, Mauricio Benty, brings forth these issues in this matter:

- Mr. Benty was the victim of a use of excessive use of force at the hands of two correctional officers working in the Butler County, Ohio, jail, the force was objectively *unreasonable*, and Mr. Benty had done nothing to warrant the use of any force.

- The injuries Mr. Benty suffered because of the use of excessive force caused serious and permanent bodily injury.

- Mr. Benty was subjected to racially motivated threats such as "I'll knock your gold teeth out you fucking nigger!" and "I will knock your gold teeth out."

- That the officers acted willfully, cruelly, maliciously and sadistically; with no legitimate penological purpose; and their actions resulted in intentional infliction of pain and emotional distress.

- That in their use of excessive force the officers failed to follow written policies and procedures, those of the State of Ohio, and the policies of the Butler County Sheriff's Office.

- That Butler County adopted, enforced, and acquiesced in policies, customs and jail practices, and inadequate supervision and training for jail staff, resulting in harm to Mr. Benty.

This summary is not intended to capture all the elements or language of Mr. Benty's complaint, but rather to focus on my assessment from a custodial, jail professional perspective of the harm that Mr. Benty suffered as correctional officers of the Butler County Sheriff's Office were allowed, and endorsed to practice tactics that violated Mr. Benty's rights.

This report examines:

1. The critical importance of contemporary correctional policies, procedures, training, supervision, oversight, investigations, and leadership to guide jail operations and the obligations of Butler County and the Butler County Sheriff's Office.

2. The Ohio Minimum Jail Standards and the County's compliance as an indication of the County's commitment to maintaining a Constitutional jail.

3. How Mr. Benty came to be injured on May 30, 2019.

4. The investigation into the use of force that resulted in Mr. Benty's injury.

5. Racial slurs directed to Mr. Benty.

6. The employment histories of the two officers involved in the injury to Mr. Benty.

7. Training within the Butler County Sheriff's Office and of the individuals involved.

8. The County's and the Butler County Sheriff's Office's indifference to the uses of force involving officers in the jail and their gross failure to protect inmates from harm, resulting in an environment in which Mr. Benty was attacked.

9. The failure to investigate the use of force that resulted in Mr. Benty's injuries, failure to review completeness of employee statements, failure to address inconsistences in statements, failure to review the prior uses of force of employees involved, failure to initiate employee discipline, and failure to implement corrective actions to address inmate protection from harm, specifically for Mr. Benty. Documentation demonstrates that the County has been aware of these deficiencies since at least 2015, that the same deficiencies were flagged again in 2018, and that the County did nothing to correct these deficiencies.

I examine each of these areas and with the use of documents produced (or not produced) by the County as well as of other contemporary corrections materials, develop and express

my opinions to a reasonable degree of professional certainty. Central among these opinions is that the County, and the Butler County Sheriff's Office directly contributed to the Constitutional violations and that this resulted in serious harm to Mr. Benty. The County and the Sheriff should have known what was happening in the BCJ, yet they allowed, and even encouraged by failure to act, operational protocols and tactics inconsistent with accepted correctional practices and Ohio Minimum Jail Standards, and failed to provide oversight, investigations, and personnel actions to prevent harm to Mr. Benty. Thus, the County shares, with corrections officers Thurkill and Morgan, responsibility for the Constitutional violations to which Mr. Benty was subjected.

> The Complaint:
>
> Late at night on May 30, 2019, Mr. Mauricio Benty, was summoned by corrections officers to his disciplinary hearing, stemming from a questionable allegation that Mr. Benty engaged in an altercation with another inmate in the Butler County jail. When Mr. Benty left the hallway in which the hearing was being held, located immediately adjacent to his assigned housing unit, the Sergeant holding the hearing objected to his leaving, and called him back. The Sergeant then told a corrections officer to have Mr. Benty return, and in the course of that action, Mr. Benty was grabbed by the officer and the sergeant, who Mr. Benty believed were going to propel his head into a wall. While trying to protect his head, Mr. Benty's left shoulder was rammed into a wall, resulting in a broken left clavicle, surgery, and long-term disability and pain. During the course of this altercation, Mr. Benty reports that officers said, "I'll knock your gold teeth out you fucking nigger!" and "I will knock your gold teeth out."

## II. McCampbell Background and Qualifications

I have been retained by the Complainant, Mr. Mauricio Benty, to review this matter and provide my findings and conclusions based on more than forty years as a correctional practitioner. My CV is included as Attachment 2.

I hold a Bachelor of Arts in Political Science from the School of Government and Public Administration, The American University, Washington, D. C., and a Master's Degree, City and Regional Planning from the School of Architecture and Engineering, the Catholic University of America.

During my career I worked as:

- Research Assistant at The Brookings Institution, Washington, D.C.,
- A regional criminal justice planner in Northern Virginia,
- A program director at the Police Executive Research Forum, Washington, D.C. focused on the development and implementation of the standards for the Commission on Accreditation for Law Enforcement,
- Assistant Sheriff, Office of Sheriff, City of Alexandria, Virginia, and
- An Assistant Director, Director and Chief Deputy/Acting Sheriff for the Broward County Sheriff's Office, Fort Lauderdale, Florida.

During the time that I worked for both the Alexandria City Sheriff's Office and the Broward County Sheriff's Office the agencies received accreditation through the Commission on Accreditation for Law Enforcement Agencies (Alexandria), the Commission on Accreditation for Corrections (Alexandria and Broward), and the National Commission on Correctional Health Care (Alexandria and Broward). The accreditation from the Commission on Accreditation for Corrections, while I was responsible for the jails for the Broward Sheriff's Office, was the largest single-site accreditation to date, covering three facilities and 4,000 inmates.

Since starting my businesses in 1999 (the Center for Innovative Public Policies, Inc. (CIPP), and McCampbell and Associates, Inc.) I have worked in a variety of roles including: conducting investigations for the Special Litigation Section, Office of Civil Rights, U. S. Department of Justice which accounts for approximately twenty investigations. I was contracted by the Office of Civil Rights and Liberties, Department of Homeland Security as an investigator; Special Master in the matter of the U. S. vs. US Virgin Islands (prison conditions) for six years; Federal Court Monitor (U.S. v. Cook County, Ill. (jail conditions case) for six years; Federal Monitor (LaShawn Jones et. al. vs. Marlin Gusman) (Orleans Parish, La.) for six years (jail conditions case); Court Monitor in a private settlement for a New Jersey County Jail for six years (jail conditions case); Lead Federal Count Monitor in the matter of the U.S. vs. Miami-Dade County, Florida since 2013 to the present (jail conditions, medical and mental health care); and a Court Monitor in the matter of the U. S.

vs. Los Angeles County, California (use of force) since 2018.[1]  I have also been involved in investigations of the Employment Litigation Section, Office of Civil Rights, U. S. Department of Justice.

Of particular relevance to this matter is my professional experience in evaluating and investigating  jail-based uses of force in terms of policies, procedures, organizational responses, internal culture, supervision, training, and personnel.  I conducted such reviews as part of investigations for both the Department of Justice and the Department of Homeland Security, and in the monitoring of litigation, in Cook County, Illinois, Orleans Parish, Louisiana, Miami-Dade County, Florida, and Los Angeles, California.  This extensive monitoring was on-site, reviewing use of force incidents (reports, videos, interviews, etc.), and interviewing inmates.  The result of this work was substantial recommendations to address avoiding uses of force, improved and accurate reporting, employee training, management of inmates with mental illness, evaluation of reviews by supervisors and agency leaders, data collection and analysis, and development and implementation of corrective action plans.

From 1995-1999 I served on the 19-member Florida Criminal Justice Standards and Training Commission, appointed by Governor Lawton Chiles.  The Commission oversees all training and licensing for the more than (at that time), 70,000 law enforcement, correctional probation officers, and corrections officers.[2]

CIPP (www.cipp.org) has been awarded grants for work in the justice system by the Kaiser Family Foundation, the U. S. Department of Justice's National Institute of Justice, and the U. S. Department of Justice's Office of Justice Programs, Bureau of Justice Assistance to further work in the field of jails, corrections, leadership development, harm reduction, and The Prison Rape Elimination Act of 2003 (PREA).  CIPP developed and published substantial work on jail leadership issues for the U.S. Department of Justice's National Institute of Corrections (NIC).

---

[1] United States of America v. Cook County, Illinois, et. al. Case No.: 1:10-cv-0946; LaShawn Jones, et. al. and The United States of America v. Marlin Gusman, Sheriff, Defendant, Case No.: 2:12-cv-00859; United States of America v. Miami-Dade County; Miami-Dade County Board of County Commissioners; Miami-Dade County Public Health Trust, Case No.: 1:13-cv-21570; United States of America v. County of Los Angeles, et al., U.S. Case No.: 2:15-cv-05903
[2] https://www.fdle.state.fl.us/CJSTC/Commission.aspx

I have authored many publications, journal articles, and training materials identified in my attached CV.  Recently I authored *Root Cause Analysis to Improve Jail Safety:  Getting Past Blame* which examined the status of self-critical analysis in jails and developed a framework for implementing root cause analysis.

In 2018 I received the American Jail Association's highest professional recognition, the Francis R. "Dick" Ford award for exceptional leadership, vision, and commitment to the professional advancement of local corrections and support of the American Jail Association.  I am a Certified Jail Manager (CJM), since 1998, and the only jail professional in the United States to be awarded a "life-time" CJM in recognition of service to the field and to the American Jail association.  In 1998, I received the EPIC award (Exceptional People Impacting the Community) from the Mental Health Association of Broward County, Florida.

I currently am the lead instructor for the National Jail Leadership Command Academy ([http://www.nationaljailacademy.org](http://www.nationaljailacademy.org)) , a joint venture of the American Jail Association and the Correctional Management Institute of Texas, Sam Houston State University.  Since the Academy's inception in 2009, almost 1,600 emerging jail leaders have participated in this intensive leadership program.   I also speak at national conferences such as National Sheriffs' Association, American Jail Association, American Correctional Association, American Probation and Parole Association, National Association of Civilian Oversight of Law Enforcement, and at many state and regional  corrections and law enforcement organizations.

I previously served on the Board of Directors of the American Jail Association and the American Probation and Parole Association.  I also served on the Board of Directors of the Broward County Mental Health Association.   I am a life member of the American Jail Association and the Texas Jail Association.

My current compensation in this matter for review of materials and preparation of this report is $300/hour.

The Butler County Sheriff's Office, Corrections Division has, according to the agency's website, three facilities in the City of Hamilton, Ohio although two no longer hold inmates.[3,4]  The Corrections Center is reported to have a capacity to house 848 maximum and medium security inmates.  The Ohio Department of Rehabilitation and Correction recommended in 2019 the housing capacity at 756.[5]  The Butler County Sheriff's Office website no longer provides access the agency's annual reports (2012-2015) presumably giving information about the number of inmates in custody in 2019 and the number of staff assigned to corrections.[6]  The most current available information about the jail in this report comes from Butler County's audit under the Prison Rape Elimination Act of 2003 (PREA) conducted in 2014.  This report states that in the past twelve months, the jail's average daily population was 848, with an average length of stay of 21 days.[7]  The audit report further states that the organization has 381 total staff, with 154 assigned to corrections.

The Sheriff's Office's proposed budget for 2021 was $43.7 million.[8]  Data regarding the BCJ  (e.g. booking, average daily population, male inmates, female inmates, etc.) is not posted on the website of the Buckeye State Sheriffs' Association, where other Counties post data and information.[9]  The Sheriff's website notes 889 individuals in custody on June 21, 2022, apparently above rated bed capacity of 848.[10]

---

[3] https://www.butlersheriff.org/corrections/jail-facilities/ Resolutions Jail which no longer houses inmates and serves administrative functions http://www.butlersheriff.org/general-info/contact-us/resolutions-jail/ Court Street Jail which no longer houses inmates and services administrative functions http://www.butlersheriff.org/general-info/contact-us/court-street-jail/

[4] A letter to Sheriff Jones, Butler County, dated February 1, 2021 from the Ohio Department of Rehabilitation and Correction noted that there were 89 inmates housed in the Court St. Jail, and stated that the capacity of that facility is 149. https://drc.ohio.gov/Portals/0/2020_ButlerCoCOurtSt_CvrLtr_1.pdf

[5] February 11, 2020 Letter to Sheriff Richard Jones from Stephen Holland, State Jail Inspector https://drc.ohio.gov/Portals/0/2019_ButlerCoCC_AI.pdf

[6] As of June 21, 2022. https://drc.ohio.gov/Portals/0/2020_ButlerCoCOurtSt_CvrLtr_1.pdf

[7] https://www.butlersheriff.org/corrections/butler-county-jail-prea/

[8] https://www.journal-news.com/news/butler-county-sheriff-looking-to-boost-budget-by-nearly-10-next-year-whats-in-the-plans/R3IAR3N7TBH2BHVVED2LPQ26BA/

[9] https://buckeyesheriffs.org/statistics-ohio.php

[10] https://butler.miamivalleyjails.org/DEFAULT.ASPX?KZCMD=BACK&AGENCY_ID=65235&Jail=1&ADMIN=1&DOB=.null.&STARTDATE=6/21/2022%2010:37:15%20AM&ENDDATE=6/20/2022%2010:37:15%20AM&Kzsearchpagecontrol1_SortBy=AGENCIES.JAIL_POPULATION&Kzsearchpagecontrol1_PageNumber=0&NewsSearchControl_SortBy=PRIORITY&NewsSearchControl_PageNumber=0

Unlike most jails of this average daily inmate population, in 2019 this jail's closed circuit television system did not continually record all camera feeds. If the control center was notified that there was an incident, the staff could then activate recordings. The excuse given for not recording all cameras was that the cost was too high to storie all the recorded videos. There were also no body-worn cameras, nor were handheld cameras routinely used to record incidents, or any planned uses of force. This absence of video capability is significant as it undermines the ability of the County to perform meaningful evaluations of uses of force, and alerts both inmates and staff that little is actually recorded as documentation of any interactions. This deficiency is also noted in an inspection by the Department of Homeland Security in its 2015 audit.[11]

In my professional experience in more than twenty years of investigating misconduct in jails and prisons, I have come across circumstances where employees, being fully aware of what specific areas of an institution are surveilled by cameras, willfully conspire to move inmates away from these areas to engage in prohibited conduct such as uses of force and sexual misconduct. If there is no reason or incentive to "hide" the activity, competent and professional staff recognize that having cameras document their activities is their best defense against allegations of misconduct. Inmates also know what areas of facilities are on camera or not, and their behavior is often guided by this information as well. As will be discussed later in this report, if uses of force happen away from cameras, or are not otherwise recorded, this is more reason for timely and through investigations.

On July 11, 2019, Lt. Fisher directed a memo to corrections staff telling them that signs had been placed in the "intake garage" that the use of body worn cameras by arresting agencies is "prohibited." [BS002467] This memo, again not a policy, raises questions as to what the jail fears from the use of body worn cameras (most probably in the intake area).

---

[11] U. S. Department of Homeland Security, Immigration and Customs Enforcement, Office of Professional Responsibility Inspections and Oversight Division, Office of Detention Oversight Compliance Inspection, Enforcement and Removal Operations ERO Detroit Field Office Butler County Jail, Hamilton, Ohio, April 28 – 30, 2015 https://www.ice.gov/doclib/foia/odo-compliance-inspections/butlerCountyJailHamiltonOhApr28-30-2015.pdf page 12

In May of 2021, Lt. Reynolds issued a memorandum to "all staff" noting that "In an effort to be more transparent we are requiring the use of a hand held camera on all known use of force incidents." [BS002812].   In addition to being too late to assist in Mr. Benty's assault (should the officers involved have been knowledgeable enough to anticipate a possible use of force) this memo is problematic for several reasons:  it specifies "known use of force incidents" without definition; and because it is a memo and not a policy amendment it provides no direction on how this is to be accomplished, where cameras are stored, who is responsible to ensure the batteries are charged, who is training staff to use the cameras, and how the footage is used in investigations.  I can, therefore, conclude that such an effort at transparency is spurious.  As is noted later in this report, this is a violent jail, as measured by uses of force against inmates.  Although use of cameras is not the answer to preventing uses of force, but it is a valuable tool in assessing staff performance and in investigating allegations of staff misconduct.

From 2003 to mid-2021, Butler County and the Butler County Jail had a contract with the U. S. Department of Homeland Security, Immigration and Customs Enforcement to hold Federal prisoners.  In ending this contract, the Sheriff cited what he considered to be unreasonable and cost prohibitive mandates to hold prisoners.[12]  In 2010, the Sheriff's website notes that the revenue from boarding of prisoners was $2,827,262.[13]

## IV.    Governance of Correctional Practice

A.  Policies and Procedures in Jail Operations

Critical to understanding the scope of the deliberate indifference of Butler County and the Butler County Sheriff's Office in establishing policies and procedures for the jail is the lack of sufficient direction to employees to protect inmates from harm, particularly Mr. Benty.

There is a large body of available (and no cost) information for jail leaders about how to develop jail policies and procedures.[14]  The Ohio Minimum Standards for Jails also provide direction to jails.   Yet, in spite of what is widely known as accepted correctional

---

[12] https://www.cincinnati.com/story/news/local/butlercounty/2021/05/26/butler-county-ending-partnership-ice/7448991002/
[13] https://www.butlersheriff.org/finance/budget/
[14] For example, see www.nicic.gov U. S. Department of Justice's National Institute of Corrections

practice for jail policies and procedures, the Butler County Jail failed consistently to develop even rudimentary direction to employees for critical operations.

What the Butler County's jail failed to do, put succinctly, is as follows:

"There are several policy formats in use. Whatever format you use, it needs to answer a few strategic questions:

- **Policy** answers "what," as if to say, "This is what we stand for, this is what we do." It is the written directive around a particular issue or topic. Policy statements should be in plain language so there is no confusion over meaning.
- **Purpose** answers "why." It is the rationale and basis for adopting the policy, documenting that it is grounded in more than preference or administrative whim.
- **Procedure** answers "how" an agency needs to implement the policy, using step-by-step, precise language.
- **References** provide background and sources behind the policy and serve as supporting documentation."[15]

"A policy is a definitive statement of position on an issue concerning the organization's effective operations.  A procedure is a detailed, step-by-step description of activities necessary to fulfill the policy."[16]

Writing policies and procedures is just the first obligation in Butler County's responsibilities. The policies must also describe how activities are to be performed by each employee, establish accountability for oversight of operations, collect and analyze data for each functional area to evaluate functions, and provide training aligned with the policies. The training requires documentation, that is, lesson plans, as well as evidence that those trained demonstrated their competence (e. g., testing).  Policies must also provide for the processes to evaluate employee compliance, investigate allegations of non-compliance, and support data collection and reviews regarding operations (e. g., use of force reports, grievance logs), employee discipline, and corrective actions to address deficiencies.

It is wholly insufficient for a jail to include, verbatim, in its policies the language of the state's Minimum Standards as the only direction to employees.  The state's Minimum Standards language is not specific to operations in the Butler County Jail.  This standards'

---

[15] U. S. Department of Justice, Bureau of Prisons, National Institute of Corrections, https://nicic.gov/projects/correctional-policy-and-procedure accessed June 26, 2022.
[16] U. S. Department of Justice, Bureau of Prisons, National Institute of Corrections, Developing and Revising Detention Facility Policies and Procedures, page 1, https://s3.amazonaws.com/static.nicic.gov/Library/018679.pdf accessed on July 26, 2022.

language does not instruct employees on the "how" of a policy statement.  Using the state's language results in lesson plans (if any exist) which are not relevant to the Butler County jail to guide employees in their work or to supervisors in their oversight.  Finally, there is no accountability for operations, no way for leadership to determine if policies/procedures are effective or are even being followed by employees .

There is a multitude of resources for the County to use in establishing, updating, and implementing effective policies and procedures.  For example:

> **"Procedures** should concisely and clearly describe specific actions to be taken to carry out the policy and be written in present or future tense.  Criteria for procedure statements:
> - A procedure cannot exist without a policy.
> - Procedural steps should be ordered in sequence.
> - The responsible individuals or functional units must be identified in each procedural step.
> - Times and locations for completion of activities must be included in the steps where applicable.
> - Any form to be completed must be identified by name and number in the appropriate procedural steps.
> - The modes of communication must be included in the appropriate steps.
> - Provisions should be included for handling major problems that could arise in the completion of the procedure.
> - Situations should be identified in which personnel are allowed to exercise discretion.
>
> Procedures typically involve a series of actions to be performed by certain persons and under certain circumstances. Staff availability, physical plant capabilities, equipment, inmate behavior and needs, and other factors can affect the course of action. If necessary, develop scenarios based on these conditions to describe and organize the sequence of activities to be included. Consider various scenarios to determine the most appropriate course of action."[17]

Information in the Inmate Handbook, a critical communication mechanism also should flow *from* the agency's established policies and procedures, not the other way around. Policies and procedures relative to Mr. Benty's care inside the Butler County jail

---

[17] IBID, page 12.

don't meet these basic guidelines. The disconnects and deficiencies in Butler County's guidance of jail operations are numerous:

1. Many of the policies and procedures provide NO direction to employees (and consequently to inmates) as to how to perform their work. The County chose to repeat, verbatim, the Ohio Minimum Jail Standards, without telling employees how to implement the standards' language. The major consequence of this grave deficiency is that it enables staff to operate independently, and suffer little or no consequences for their actions. A clear example of this is provided in Section IV. D. i. of this report regarding the jail's inmate disciplinary procedures.

2. The jail's policies and procedures provide NO direction to supervisors as to their roles in overseeing what are essentially vague or nonexistent protocols. This allows employees to devise their own strategies such as in uses of force. In the matter involving Mr. Benty, this resulted in a very questionable disciplinary "write-up", and a disciplinary hearing held absent any guidelines (other than apparently "tradition") for an inmate housed in a "psychiatric POD" with a mental health diagnosis, and resulting in a negative outcome for Mr. Benty.

3. Policies and procedures must be specific to provide for the development of training lesson plans to assure all employees work within the mandates of the Constitution, case law, Ohio Minimum Jail Standards, and accepted practice.

4. The County provided no training lesson plans for operations critical to this review – use of force, inmate disciplinary processes, staff duty to report, management of inmates, investigations, accountability, and leadership obligations.[18]

5. The County provided no training records for employees involved in this incident which would have allowed me to specifically assess the topic trained, the materials covered, the relevance to operations in the Butler County jail, and whether the officers demonstrated any competence in the topic.

6. The County's policies provide NO monitoring of employee compliance, identification or documentation of compliance, periodic checks of those documents (if they exist),

---

[18] The County provided a lesson plan for "Subject Control Instructor", but no lesson plans for how this information was Butler County jail officers were trained. [BS001966-002321].

or internal observations or inspections[19].   The out-of-control number of uses of force in the Butler County Jail are evidence of this.

B. Ohio Minimum Standards for Jails[20] and Butler County's Compliance

The Butler County jail is required to comply with the Minimum Standards for Jails in Ohio.  Section 5120.10 of the Ohio Revised Code delegates to the Ohio Department of Rehabilitation and Corrections (ODRC)'s Bureau of Adult Detention (BAD) the responsibility to create minimum standards for jails, and for the inspection of jails to ensure compliance with the "Minimum Standards for Jails in Ohio.[21]  Rule 5120:1-0-8 to 5120:1-12-18 requires jails to comply with standards, using "shall" as the descriptive mandate (as opposed to "will" or "may" – more permissive language).  The paragraphs of the standards are identified as "important"[22] or "essential".[23]

The goal of Ohio's standards is to support good correctional practices in  life, safety and health of inmates, employees, contract employees, and volunteers, operations, inmate services, physical plant, safety and emergency procedures, sanitation, food services, inmate rules and discipline, and other areas that address good correctional practice.[24]

Regarding Minimum Standards for Jails, guidance is provided to jail administrators by the Bureau of Adult Detention, including the ". . . need to compare the new or revised jail standards to your current policies to make sure they are compliant."[25] Further, the state's direction to jail administrators: "To assure that policy is effective, everyday practice must

---

[19] Op. Cit. Developing and Revising Detention Facility Policies and Procedures, page 21.
[20] https://drc.ohio.gov/Portals/0/BAD/Minimum%20Standards%20for%20Jails.pdf?ver=2016-09-22-135837-547
[21] https://drc.ohio.gov/bad
[22] "Important Jail Standards": These jail standards have been designated to support good correctional practices in training, operations, inmate services, physical plant, safety and emergency procedures, sanitation, food service, inmate rules and discipline and other areas that address good correctional practice. All full service and minimum security jails shall comply with **90%** of all important standards." [emphasis added] https://drc.ohio.gov/Portals/0/BAD/JailAdministratorsResourceGuide.pdf?ver=2016-09-22-135837-063 page 5 of 114.
[23] "Essential Jail Standard": These jail standards have been designated to directly support the life, safety and health of jail inmates, employees, contract employees and volunteers. All full service and minimum security jails shall comply with **all** essential jail standards." [emphasis added] https://drc.ohio.gov/Portals/0/BAD/JailAdministratorsResourceGuide.pdf?ver=2016-09-22-135837-063, page 4 of 114.
[24]Op. Cit., footnotes above.
[25] 5/14/2014 Standards for Jails in Ohio, Jail Administrator Resource Guide for Jail Inspections, https://drc.ohio.gov/Portals/0/BAD/JailAdministratorsResourceGuide.pdf?ver=2016-09-22-135837-063, page 73 of 114.

match policy, and policy should be a realistic representation of the ability of the jail to carry out practices and procedures."[26]   This provides guidance to the Butler County jail, in addition to the professional guidance noted earlier in this report, which is widely available and at no cost.

The significant dilemma for the "Post Orders[27]," which serve as the policies for the Butler County Correctional Center (Jail), is that, as noted earlier, many of these "Post Orders" repeat, verbatim, the language of the standards, but DO NOT operationalize the requirements to everyday jail practice.  Conversely, where jail-specific language is included in a Post Orders,  the requirement that "The jail standards should be specifically stated and referenced in your policy" is often not met.[28]   For example:

- HOU-07, Inmate Segregation, [BS003523-003544] repeats the state standards language verbatim (pages 1 – 2) but does not provide direction to staff (and hence to inmates through the Inmate Handbook) of how those function take place or how outcomes are documented, and provides for no management or leadership accountability due to this lack of specific direction.   As noted in his report, there are consequences to this absence of direction to employees and supervisors.
    - Another of the Butler County jail's violation of this state standard, specifically, is in regard to approvals of disciplinary isolation for more than 120 hours, and sanctions of more than 60 days.  This isn't documented in any materials produced by the County.
- HOU-33, Inmate Grievance Procedures. [BS003563-003568] The vernacular in the Butler County jail is that grievances are termed "kites", and the word "kite" is not in the jail's policy; nor is that language in the Inmate Handbook.  This then begs the question of whether or not there is in actuality a grievance process at the jail.  Examining the responses to the "kites" filed by Mr. Benty suggests that

---

[26] IBID, page 73 of 114.
[27] The term "Post Orders" as used by the Butler County jail is not the commonly used in this manner in corrections.  "Post order" is a terms which generally defines the job duties and responsibilities of a specific work station/assignment (post) physically located in a jail.  Buter County uses the term to define what are really policies and procedures.
[28] IBID, page 73 or 114.

the electronic kiosks are the grievance mechanism and allow inmates to ask questions, which might better be directed to the officer working in their unit, or file medical complaints as well as initiate a grievance.   On June 7, 2019, Mr. Benty writes in the electronic kiosk system "Can I please have a formal grievance form," to which the response is "The Officer will get you one." [BS00308] Yet the Inmate Handbook states that inmates should "Access a formal Grievance Form on the kiosks."  [BS002990]. The point of the above narrative is that there is not a clear connection between what is written in the policy (HOU-33) and the Inmate Handbook, which raises the question of the integrity of the entire process. Finally, HOU-33 provides "All grievances will be logged by Inmate Services," a document(s) not produced by the County [BS003564].

- HOU-10, Inmate Discipline [BS003545-003561] is addressed in Section IV. D. i. of this report – and results in the same conclusion that the jail does not have sufficient policies and procedures consistent with the direction of the Minimum Standards.

Although other examples can be provided, the above analysis is sufficient to demonstrate that critical policies in this jail do not support good correctional practices, provide direction to employees, provide documentation, or provide any accountability.

As a measure of the lack of commitment of Butler County, the Butler County Sheriff and the Jail to compliance with the Minimum Standards, the record from ODRC is discussed below:

- On February 26, 2021, the jail's self-audit documented non-compliance with 1 essential standard, which is not named in the letter but is identified in a subsequent letter of August 16, 2021[29] [BS003978] as 5120: 1-8-09(D), a substantially critical paragraph regarding inmate health care.[30]

---

[29] https://drc.ohio.gov/Portals/0/2020_ButlerCoCorrCompl_FinalLtr%20_1.pdf

[30] (D) (Essential) Health appraisal. Within fourteen days, a licensed nurse, physician, physician's assistant, EMT or paramedic shall complete a health appraisal to determine the medical and mental health condition for each inmate in custody. Such appraisal shall at least include the following:  (1) Review of receiving screen. (2) Collection of additional data to complete the medical, dental and mental health history. (3) Laboratory and/or diagnostic tests to detect tuberculosis and other suspected communicable diseases as designated by the health authority. (4) Recording the height, weight, pulse, blood pressure and temperature. (5) Medical examination as determined by the examiner.(6) Mental health assessment.(7) Initiation of therapy when

- On September 4, 2020, ODRC notified the Sheriff that the jail remained out of compliance with "important" standard 5120:1-8-04 (A) [BS003976],[31] and with "essential" standard 5120:1-8-09(D) (03)[32]

The County's non-compliance with such critical requirements, and inconsistency with the Constitutional mandates for jail inmates' health care, raise serious questions about the County's commitment to accepted correctional practice and about the interest or quality of the leadership by the Sheriff and Jail Administrator.

C.  Butler County's Obligations Regarding Jail Oversight

The funding for the Butler County Sheriff's Office comes predominantly from the taxpayers of Butler County, Ohio.  While the Sheriff may have revenue from contracts (such as previously from the Office of Homeland Security), much of the money comes from County's taxpayers, and the budget process is governed by state and local ordinances and laws.  As such the County has an obligation to ensure that the funding is used to operate a Constitutional jail.  The County is informed about the operations of the jail through its independent oversight, the budget process, grand juries, inspection reports from the Ohio Department of Rehabilitation and Corrections, news and media accounts of jail activities, and from the families of inmates held in the jail, the audits required by the Prison Rape Elimination Act of 2003, and/or via reports of the U. S. Department of Homeland Security. Many sheriffs around the country post their annual reports on-line to help educate the community as well as highlight their services, but the Butler County Sheriff's annual reports have been removed from the Sheriff's website.[33]

Regardless of the means or methods, the County (elected officials, appointed administrative officials, and community members) is a component stakeholder of the jail's operation just as the jail is part of the County and its community.  For example, the National Association of Counties (NACo) provides a primer for locally elected officials that includes

---

[31] (Important) Thirty-five square feet per number of occupants occupying the dayspace at one time. Minimum size of one hundred five square feet.
[32] IBID
[33] http://www.butlersheriff.org/BCSO/other-content/2015-Annual.pdf and from 2009 forward, no reports can be accessed.

determined necessary by the examiner. (8) Development and implementation of a treatment plan. (9) Other test and examination as determined by the examiner or health authority.

the local government's oversight and responsibilities for their local jail.[34]  Butler County is a member of NACo.  There are no credible excuses for the County to NOT know what's happening in their jail.

    D.   Critical Shortfalls – Jail Policies, Procedures and Impact on Mr. Benty

As a general statement, all the policies I reviewed relevant to the matter of Mr. Benty's treatment are inadequate for the reasons noted above (e. g. lack of specificity, lack of direction, lack of documentation, lack of accountability).  Among the policies that are wholly insufficient are:

- ICE-14 Post Order Use of Force – a totally inadequate less than one page recitation of the state minimum standard 5120 :1-8-03 B. 10 a. – d.[35]
- SGT-15 Critical Incidents 2013 – which mandates review of incidents , including inmate/inmate assaults and inmate/staff assaults and uses of force – none of which have been produced by the County [BS003603]
- SGT-27 Staff Training - an example of verbatim recitation of the state minimum standards [5120:1-8-18] without relevance specifically to Butler County
- SGT-28 – Staffing – an example of verbatim recitation of the state minimum standards [5120:1-8-17] without relevance specifically to Butler County
- SGT-19 Security 2016 - an example of a partial verbatim recitation of the state minimum standards [5120:1-8-03] without relevance specifically to Butler County
- HOU-04 Incident Reports 2013 – essentially an instructional manual for how to use the jail's information system and enter data
- HOU-07 Inmate Segregation – information rather than direction to employees
- HOU-10 Inmate Discipline 2016 – see below for an inclusive narrative about the deficiencies in this policy.
- HOU-33 Inmate Grievance Procedures 2014 – which describes a procedure that does not appear to exist or be documented.
- Clas-04 General Housing Assignments 2018 – which describes a very elementary inmate separation policy, and provides no oversight or validation.
- Policy 5.01 Use of Force – see below for additional analysis.

---

[34] County Elected Officials Guide to Criminal Justice System Decision Making, The Justice Management Institute, National Association of Counties, Pretrial Justice Institute, September 30, 2016, https://www.naco.org/sites/default/files/documents/County%20Elected%20Officials%20Guide%20to%20Criminal%20Justice%20Decision%20Making_FINAL.pdf page 11
[35] The written directive system of the Butler County jail does not differentiate in the titling of the policies as to whether the designation of "ICE" is intended to apply to only to Homeland Security detainees, or all detainees. In the absent of this information, I conclude based on the information provided by the County that these policies apply to all inmates held in the jail.

There are policies and procedures missing from the County's production of documents in critical areas, such as policies governing the field training and supervisory field training program.  Because of the County's duty to  respond to Mr. Benty's document requests, these presumably would have been produced if they exist.

1. Example – Jail Disciplinary Procedures - Inmate Disciplinary Process at the Butler County Jail Violates Ohio Minimum Jail Standards
   Practically and operationally, what did the County's and the Sheriff's Office's lack of, and indifference to, operationalizing the state minimum standards and accepted correctional practice mean to Mr. Benty?  This analysis, below, examines the Butler County's inmate disciplinary vague processes, the mismanagement of which ultimately resulted in actual physical harm to Mr. Benty.

   The inmate disciplinary procedures of the Butler County jail, in practice, violate the Ohio Minimum Jail Standards 5120:1-8-12, 14.  The jail adopts the Ohio Minimum Standards verbatim into policy (e. g. Post Orders HOU-10, Revised March 16, 2016 BS 003545-003561) without describing how the standards are operationalized in the Butler County jail.  Merely repeating standards' language absent the implementation for the BCJ is shockingly inadequate in terms of operational accountability and inmate safety.

   Mr. Benty was subjected three times in 2019 to the BCJ's inmate disciplinary process.  [BS 00009, 00010, 00011]   The jail incident report precipitating the disciplinary hearing in which Mr. Benty was assaulted  by staff on May 30, 2019 [BS000374] is very vague in terms of Mr. Benty's involvement in the alleged violation of jail rules, with the reporting officer noting that "Benty attempted to swing back however no contact was made."  In a review of the incident (inmate to inmate assault) dated May 29, 2019, the employee notes are "inmate to inmate altercation, not sure if anyone made contact. No injuries." [BO000438]. Further, Sergeant Benjamin writes in a memo to Lieutenant Reynolds on May 29 2019 that "According to the inmates, they did not make

contact with each other.  Officer Jenkins stated he saw Felix swing at Benty."
[BS00438][36]

Yet, in spite of no evidence of a fight, Mr. Benty was charged with, and found guilty by Thurkill of, these violations:  "C-9 Inmates may not assault or fight with any staff member, visitor, or other inmate; and C10 Inmate may not participate in any act which constitutes a threat to the security of the facility its staff, other inmates, visitors or to the inmate him or herself." [BS002992]

Importantly, other than this report [BS000374], there was no review of the incident by supervisors to ascertain its veracity, given that it constituted a "major" inmate rule violation that could [and did] result in a significant sanctions for an inmate.  The County did not produce the disciplinary report regarding Mr. Felix, which may have provided a broader view of the incident and of the sanctions imposed on Mr. Felix for instigating the incident.

The most glaring violations of Ohio Minimum Jail Standards of the inmate disciplinary process, and for Mr. Benty, were:

- Minimum Jail Standard 5120:1-2-12 Prisoner Discipline "(B) (1) The jail administrator or designee shall approve any penalty exceeding suspension of rights or disciplinary isolation for more than 120 hours." [BS003545]
    - o Mr. Benty was "sentenced" to 60 days of "isolation" [1,440 hours] with no documentation provided by the County that the jail administrator approved the penalty.
    - o There is no space on the County's "Disciplinary Notice" form to allow for the jail administrator's concurrence with the penalty.
    - o The instructions for processing inmate disciplinary hearing outcomes do not provide for a copy to be provided to the jail administrator. [BS003561]

---

[36] The co-housing of Mr. Felix (a federal inmate) and Mr. Benty (not a federal inmate) also raises questions of why they were together on May 29, 2018? Butler County Sheriff's Office Corrections Division Post Order Class-04, [BS003514-BS003516] dated January 5, 2016, (revised December 20, 2018) General Housing Assignments, clearly separates federal contract inmates in housing; with Federal Control inmates housed in in Blocks A-d. , page 1 and  "ICE detainees will be housed with same class levels." page 2

- Minimum Jail Standard 5120:1-2-12 Prisoner Discipline "(B) (3) Continuous confinement for more than thirty days requires the review and approval of the jail administrator or designee." (BS003545)
    - Mr. Benty was "sentenced" to 60 days of "isolation" with no documentation provided by the County that the jail administrator or designed reviewed the continuous confinement.  [BS000010]
    - There is no space on the County's "Disciplinary Notice" form to allow for the jail administrator's concurrence with the penalty .
    - The instructions for processing inmate disciplinary hearing outcomes do not provide for a copy to be provided to the jail administrator. [BS003561]
- Minimum Jail Standard 5120:1-8-14 Disciplinary hearing "(A) each full service jail shall have a written policy that specifies when and the circumstances under which a disciplinary hearing is conducted." [BS003546]
    - While the BCJ repeats this language from the Ohio Minimum Standards in HOU-10, there is no language specifying when and the circumstances under which disciplinary hearings are conducted.
    - This absence of compliance with Ohio Minimum Standards, and the County's admitted practice of holding disciplinary hearing late in the night and at a location at the discretion of the hearing officer, results in a lack of accountability in process and location, and certainly allows hearing officers to avoid locations where there are cameras or that are out of the sight of other employees (Thurkill 240:18 – 25)
-  "(B) Pre-disciplinary hearing requirements shall include, at a minimum: (1) Requirement for a written incident report . . . (4) Written notification to the prisoner of the nature and date of the violation within twenty-four hours of the alleged violation(s) or discovery of the alleged violations(s)  .

. . (C) (2) The prisoner's opportunity to be heard, present evidence and question witnesses subject to limitations imposed by the hearing officer. . . (3) A written statement by the hearing officer of the facts relied upon and reasons for the disciplinary action shall be provided to the prisoner and a copy placed in the prisoner's file.

- The County provided no evidence or documentation that a written incident report was provided to Mr. Benty ahead of the disciplinary hearing.
- The Disciplinary Notices provided by the County [BS 00009 – 00011] notes "provide as attachments to the required report, "Vision Jail incident report required[37].  Attach a copy of the report to this disciplinary notice."   This was not done based on the documents provided by the County.
- Thurkill admits that he doesn't have the information and has not even read incident reports before holding disciplinary hearings (Thurkill 241: 20), although according to Morgan Thurkill began to read the report at the start of the hearing (Morgan 129:3-4)
- The deposition testimony provided by Morgan affirm that Mr. Benty was interrupting Thurkill;  (Morgan 129:8) and
- The County provided no evidence or documentation of the facts relied upon and reasons for disciplinary action, and in fact, there is no credible review of the incident between Mr. Benty and Mr. Felix that would serve as the foundation for an inmate disciplinary hearing.

There are other discrepancies in the disciplinary hearings involving Mr. Benty.  For example the Disciplinary Notice is dated at the top of the form (presumably by jail employees) as "5/30/2019", and yet Mr. Benty's signature is dated 5/29/2019 [BS 00010].  This is more evidence about the lack of detail for a due process issue for inmates.

---

[37] Presumably "Vision Jail" is the BCJ's management information system.

Via a "kite" on June 1, 2019, Mr. Benty stated he wanted to appeal his 60-day sentence as he had not thrown a punch and he requested to call witnesses from F-pod.  Sgt. Hoffman doesn't indicate that he is considering this "kite" as an appeal, but rather notes "Your attitude during the hearing weighted greatly on the sentence." [BS00362] How Sgt. Hoffman came to write this is unclear, as is his responsibility for processing what is an appeal of disciplinary sanctions.   As with other BCJ policies, HOU-10 Inmate Discipline repeats verbatim the Minimum Standards but adds no policy for the Jail.  In this case, the standard is: "Jail prisoners shall be afforded an opportunity to appeal disciplinary actions to the jail administrator or designee." [BS003547]. The Jail's policy is stated in the Inmate Handbook (should be the other way around – that policy guides the contents of the inmate handbook – not the inmate handbook setting or guiding policy).

> "G. Appeals". The inmate has the right to appeal the decision to the Hearing Officer to the Deputy warden or to the Warden of the Butler County Jail.  If the appeal is granted the Deputy Warden or Warden shall make their own individual determination in the case and their decisions is final and cannot be appealed further."[38] [BS002994].

This language provides NO direction to the inmate and NO direction to the jail employees as to how the appeal takes place, the time frames, or review process and documentation – ergo it is a fair assumption the appeal process is ineffective or non-existent.  In this case, moreover it was Sgt. Hoffman who made the decision, violating the BCJ's own policy as well as accepted correctional practice.

Here is the point of the above assessment.  Through the Butler County jail's violation of Ohio Minimum Jail Standards, resulting arbitrary operations, failure to thoroughly document incidents, including "major" violations of inmate rules, failure to conduct even a cursory investigation, and apparently haphazard implementation of sanctions, inmates such as Mr. Benty were placed in danger due to the violations and exposed to the whims of rogue staff.  The absence of the BCJ's leadership to identify ongoing violations of Ohio standards in daily operation clearly establishes

---

[38] Accepted correctional practice regarding appeals of discipline exclude the hearing officer in the appeals process, and mandate a review by management/leadership.

the County's indifference to inmate rights and safety.[39]  Multiplying this by the County's numerous other deficient policies reveals a jail with few standardized procedures, little supervisory accountability, and absent leadership oversight.

Mr. Benty's status as an inmate with a mental health diagnosis and the impact that should have had on this hearing is addressed later in this report.

## V.      Use of Force Policy(ies) – Butler County Jail (BCJ)

The three use of force policies of the Butler County Sheriff's Office (5.01, ICE-14 and SMO-01) are all inadequate in:

1) defining specifically when force and what can be used inside the jail;

2) integrating the language of relevant polices for the jail;

3) failing to define who will review the reports;

4) providing investigations into all uses of force [none were provided by the County] nor were investigative formats offered;

5) distinguishing the requirements of the "reviews" of uses of force by the jail's (or Sheriff's Office) leadership [BS003569];

6) assuring appropriate disciplinary action(s) for employees who violate the policies;

7) requiring and documenting remedial training or retraining for employees;

8) failing to ensure that all sworn personnel are annually trained; and

9) documenting and analyzing trends in uses of force and adjusting policies, procedures, supervision, and training to conform to these findings.

---

[39] A compliance audit conducted by the Department of Homeland Security's Office of Detention Oversight in April 2021 identified these deficiencies in the jail's disciplinary proceedings, as related to the National Detention Standards (November 2019), which are pertinent to this report: "The facility's disciplinary segregation orders are not completed by the disciplinary hearing officer.  The relevant documentation was not attached to the facility's detainee disciplinary segregation files.  Disciplinary segregation orders were not completed; therefore, there is no detailed reason for placement in disciplinary segregation.  Disciplinary segregation orders were not completed; therefore, they were not provided to detainees.  Disciplinary segregation orders were not completed; therefore, they were not included in detainees [sic] detention file or maintained in a retrievable electronic format.  Disciplinary segregation orders were not completed; therefore, the releasing officer did not indicate the date and time of release." [BS0372]

The result of these collective deficiencies is a jail in which there is insufficient leadership and management oversight, and thus harm to inmates, in this instance to Mr. Benty.[40]

The County and the Butler County Sheriff were on notice of deficiencies in their use of force policies. In 2015, the Department of Homeland Security, in their annual audit of the Butler County Jail, found: [41]

- "An interview with staff revealed, the facility has one video camera to document use-of-force incidents; however, responsibility for testing the camera's operability has not been designated in a post order or by other means, and there is no documentation testing is being conducted (**Deficiency UOF-1**[41]). Page 12. [All emphasis from DHS]
- "The OIC shall designate responsibility for maintaining the video camera(s) and other video equipment. This shall include regularly scheduled testing to ensure all parts, including batteries, are in working order; and keeping back-up supplies on hand (batteries, tapes, lens-cleaners, etc.). This responsibility shall be incorporated into one or more post orders. **This is a repeat deficiency."** *See* ICE NDS 2000, Standard, Use of Force, (III)(A)(4)(l). [All the emphases are in the DHS report.] page 12
- Written procedures shall govern the use-of-force incident review, whether calculated or immediate, and the application of restraints. **This is a repeat deficiency."** *See* ICE NDS 2000, Standard, Use of Force, (III)(K). [All the emphases are in the DHS report.] page 12
- "The health care provider of each facility will conduct a health appraisal and physical examination on each detainee within 14 days of arrival at the facility. **This is a repeat deficiency."** *See* ICE NDS 2000, Standard, Medical Care, (III)(D). [All the emphases are in the DHS report.] page 12

---

[40] Several of the reports from U. S. Department of Homeland Security, Immigration and Customs Enforcement, Office of Professional Responsibility Inspections and Oversight Division, Office of Detention Oversight Compliance Inspection, Enforcement and Removal Operations ERO Detroit Field Office were not disclosed in the County's production of documents and were retrieved from the Internet.

[41] U. S. Department of Homeland Security, Immigration and Customs Enforcement, Office of Professional Responsibility Inspections and Oversight Division, Office of Detention Oversight Compliance Inspection, Enforcement and Removal Operations ERO Detroit Field Office Butler County Jail, Hamilton, Ohio, April 28 – 30, 2015 https://www.ice.gov/doclib/foia/odo-compliance-inspections/butlerCountyJailHamiltonOhApr28-30-2015.pdf pages 8 -12.

In 2018, Department of Homeland Security, in their annual audit of the Butler County Jail found:[42]

- "ODO's [Office of Detention Oversight] review of use of force policies confirmed they address the requirements of the standard;  however, there are no written procedures for after-action reviews **(Deficiency UOF-1[32])** review of use of force documentation found that while an evaluation of the appropriateness of use of force is documented on the facility's Subject Management Report, the report does not include ODO's the review and signature of the Health Services Administrator **(Deficiency UOF-2[33]) This is a repeat deficiency**." [Emphasis is DHS's] page 8

- "In addition, the records document current training in report writing, response to resistance, defensive tactics, and interpersonal communication and suicide prevention; however; *training in cultural diversity and dealing with the mentally ill was not documented.*" [emphasis added] **(Deficiency UOF-3[34])**. **This is a repeat deficiency**."  [Emphasis is DHS's] page 9

- ODO's review of the use of force files found medical evaluations of the "detainees were not included in the after-action reviews and files did not contain a medical assessment of detainees after force was used **(Deficiency UOF-4[35])**. [Emphasis is DHS'] page 9.

- "BCJ's UOF policy does not contain written procedures for after-action reviews, nor is this information contained elsewhere (**Deficiency UOF-1[28]**)." [Emphasis is DHS']

- "Written procedures shall govern the use-of-force incident review, whether calculated or immediate, and the application of restraints. The review is to assess the reasonableness of the actions taken (force proportional to the detainee's actions), etc. IGSA [*sic*] will pattern their incident review process after INS. INS shall review and approve all After Action Review procedures.  *See* ICE NDS 2000, Standard, Use of Force, Section (III)(K). **This is a Repeat Deficiency.** [Emphasis is DHS's] page 8.

Yet, nothing appears to have been done to amend policies, procedures and practices.

"Corrections Division Post Orders  SMO-01, Use of Force", while citing verbatim the Ohio Jail Minimum Standards, fails to incorporate the language in Corrections Division Post

---

[42] U. S. Department of Homeland Security, Immigration and Customs Enforcement, Office of Professional Responsibility Inspections and Oversight Division, Office of Detention Oversight Compliance Inspection, Enforcement and Removal Operations ERO Detroit Field Office Butler County Jail, Hamilton, Ohio, July 16-18, 2019 https://www.ice.gov/doclib/foia/odo-compliance-inspections/2019-ButlerCountyJail-HamiltonOH-0716-182019.pdf  pages 8 – 12.

Orders ICE-14, which provides "*In instances where the threat is not immediate and/or the detainee is in an isolated location, the officer shall make every effort to resolve the situation without use of force.*"[emphasis added] [BS003614]. This is relevant as Mr. Benty was not an immediate threat to any person, yet was subjected to force for no articulable reason other than that he was walking away from Thurkill.

Butler County Sheriff's Office policy 5.01, Response to Resistance and Deadly Force, provides yet another example of how whatever is written in policy by the Sheriff's Office is not followed operationally. For example, Policy 5.01provides [BS005247] that "Any report required by this policy receives executive review in an effort to:1. Protect the integrity of the facts and the evidence; 2. Ensure that the deputy's response to resistance complied with all appropriate state and federal law, and agency policy; 3. Determine if the deputy's response to resistance indicates a need for special counseling, training, or disciplinary action; 4. Determine whether the situation requires further action; and 5. Evaluate the need for additional, or future training." Is that, in fact, true? I conclude it is not, and to the detriment of the safety of inmates such as Mr. Benty.

In examining the "review" of Thurkill's use of force involving Mr. Benty, there is a single page with sign-off by supervisors indicating it is their opinions that the use of force was within policy - single check boxes with no notations, explanations, or evidence that the reporting was read and considered. Signing off was a sergeant (signature illegible), lieutenant (signature illegible), a division command (signature illegible), a section command (signature illegible), and a major, (signature illegible). No dates are provided. [BS00430]. As noted later in this report (see Section VII), the use of force in this incident is inconsistent with Butler County Jail's Post Orders [sic] ICE-14, Use of Force "*In instances where the threat is not immediate and/or the detainee is in an isolated location, the officer shall make every effort to resolve the situation without use of force.*"[emphasis added] [BS003614] Not one of the reviewers asked any questions about how Mr. Benty's clavicle was broken or about the discrepancies in the reports of Morgan and Thurkill. Not one of the reviewers asked why Mr. Benty was being charged with a major policy violation in which there was no evidence or documentation to sustain that charge.

The evidence is that none of the reviewers documented the reason(s) for their findings, the fact their signatures cannot be read, and that no dates are provided in toto violates the above referenced section of 5.01[BS5247].

## VI.    Use of Force and Injury to Mr. Benty

### A.  Use of Force

The central question in this complaint is how Mr. Benty came to have a fractured clavicle in the late night of May 30, 2019.  Mr. Benty's complaint states that during a disciplinary hearing on May 30, 2019, late at night, correctional officers Thurkill and Morgan tried to lift Mr. Benty and "bash his head into the wall" after which Thurkill and Morgan repeatedly kicked him.   Mr. Benty's complaint also documents that both Thurkill and Morgan used racial slurs such as,  "I'll knock your gold teeth out you fucking nigger" and "I will knock your gold teeth out."  [See also Benty: 54:15-21, 64:2-4]

This is the relevant time line of events:

- Tuesday, May 28, 2019 9:39:46 pm Mr. Benty sends a "kite"[43] requesting to move pods to avoid an altercation; and staff responds "met client on 5/30/19 but documents no resolution or response to Mr. Benty. [BS00369]
- Tuesday, May 28, 2019 9:38:56 pm Mr. Benty sends another "kite" requesting to move pods, to which staff respond <u>two days later, after the assault by staff,</u> "you are in isolation." [BS000370] [emphasis added]
- Wednesday, May 29, 2019, 1:26:04 pm Mr. Benty sends a "kite" requesting to move pods to avoid an altercation [BS00368] and there is no documentation that staff respond to that request.
- Wednesday, May 29, 2019, 2211 hours, Officer sees inmate ". . . swinging at inmate Benty. . . " [inmate later identified as Felix]
- Thursday, May 30, 2019, 1035, Mr. Benty, in a "kite," asked to be moved to a different housing unit for his own safety.  There is no evidence of staff response to this grievance.

---

[43] BCJ vernacular for an inmate grievance.

- Thursday, May 30, 2019, 2230 hours, disciplinary hearing commences in the sallyport of H1 Sallyport with Mr. Benty, Thurkill and Morgan. [BS00380-00381]
- Friday, May 31, 2019, 12:34 a.m. ordered x-rays [BS00173] confirming fracture at 6:13 a.m. on May 31st.

This time line clearly documents that Mr. Benty had no injury before his "hearing" with Thurkill and Morgan; and afterward he did. An injury so serious it required surgery and a trip to the hospital. As will be discussed later in this report (see Section VII), there was no investigation of this use of force until a purported "anonymous" letter arrived during the second week of July.

B. How Many Uses of Force Are Too Many Uses of Force?

There are no national databases that identify state-by-state definitions of, or actual incidence of uses of force in the almost 3,000 jails in the United States. Since 2016, there have been substantial research and publications to assist criminal justice agencies in better defining how they use force, employee training and investigations. This work has received wide dissemination in the field, and should be well-known to the County's leadership.[44]

Uses of force in a jail are often, in my professional experience, the result of system failures. These failures can be, at the very least:

- At arrestee intake – the screening and classification of arrestees, failing to identify risks, medical and mental health conditions posing potential harm;
- The training of those employees, both custody and medical, in performing the intake screenings;
- The training and supervision of employees charged with inmate care, custody, control, and management, particularly the supervision of inmates with mental illness;
- Separation in housing of inmates by validated risk, rather than charges or legal status (e. g. inmate objective classification);

---

[44] For example, see National Consensus Policy on Use of Force, January 2017,
https://www.theiacp.org/sites/default/files/2018-08/National_Consensus_Policy_On_Use_Of_Force.pdf

- The quality of policies, procedures, and subsequent training about these written directives for line staff and supervisors;
- The quality of medical and mental health care to address especially the needs of the inmates with mental illness;
- The emphasis of supervisory staff in assuring policies are followed;
- The quality and timeliness of investigations into allegations of staff and inmate misconduct, based on written protocols; and
- Leadership committed to transparency and accountability.

It is my professional opinion, based on years of reviewing uses of force incidents and agency responses, that a jail must, in addition to conducting competent and timely investigations, red flag an employee who is involved in more than two uses of force in a month, as a starting point, or certainly flagging an employee who uses more than four uses of force in a quarter. While these may appear to be arbitrary numbers, there must be some benchmark to trigger a review of individual employees, unless the employee is a member of specialized team such as those involved with planned uses of force or inmate cell extractions. Setting a review benchmark is particularly critical to Butler County because of the number of uses of force, the number of times an employee's name appears in their use of force logs, and the absence of any early warning system to inform leadership about emerging trends and employees who may require an intervention.

In his deposition, Morgan made the excuse that force needed to be used more against inmates with mental illness [Morgan 13:22-25, 107:2-5]. In fact, such ill-informed statements, not supported by any facts from the Butler County jail, are often the pretext for uses of force in jails whose staff are not properly trained and/or for medical providers who do not provide sufficient care for inmates with mental illness.[45] Inmates with mental illness, with appropriate care and trained staff, are no more likely to be involved in disruptions and violence in a jail setting than are general population inmates.

There was a County-reported total of **1,095** uses of force from 2018-2021; that is a just short of one use of force a day. This number should have been a substantial concern to the County just by the sheer volume. Thurkill used force, or was involved in the use of

---

[45] See also Section VI. F., of this report, Care of Inmates with Mental Illness

force, twenty (20) times in the period 2016 -2019.  Morgan used force, or was involved in the use of force, fourteen (14) times in a period of ten months, and a total of twenty-two (22) times in less than two years.[46]  In total, the number of uses of force is unequivocally too many.  The County failed to initiate any review of the uses of force to determine harm to inmates (and staff) or propose any corrective actions.  This review process is provided for in the County's own policies, as noted in this report, and the County failed once again.

The deficit in the operations of the Butler County jail is their failure to investigate all uses of force to, at a minimum, determine if the uses are objectively reasonable and meet agency policy.[47]  As is noted later in this report, there are a large number of uses of force, yet the documents produced by the County evidenced little, if any investigation of each of these.  Their policy is vague and thereby contributes to a work environment where uses of force are not timely or thoroughly evaluated, thus telegraphing the clear message to staff that they need not be concerned about their individual decisions to use force, even if inconsistent with agency policy,  accepted practice, and case law.   The same message is also equally clear to inmates who are held in this jail.

C.  Review of Mr. Benty's Medical Documentation

A review of Mr. Benty's medical file, beginning of February 27, 2019 provides no evidence of any complaints regarding pain associated with his clavicle. [BS00030 – 000296]. Mr. Benty appeared to be very familiar with how to access medical and mental health care, and the use of "kites" to articulate his complaints, given the number of encounters in his medical file and "kites" that he filed.[48]  The conclusion from the review of the medical record is that Mr. Benty had no complaints regarding pain, or an injury to his clavicle, before this disciplinary hearing with Thurkill and Morgan on the night of May 30, 2019.

On May 30, 2019 at 1035 hours, prior to the hearing with Thurkill and Morgan Mr. Benty forwarded a "kite" wanting to move pods, as he didn't want to get involved in a fight.

---

[46] See also Section VIII  of this report for the details of these uses of force for both Thurkill and Morgan.
[47] IBID, page 12.
[48] A "kite" is jail vernacular for an inmate grievance.  The BCJ's inmate grievance policy is HOU-33.  A grievance procedures for a pre-trial population is extremely important to allow for inmates to surface issues, and staff to respond, based on policy, to any emerging trends.  HOU-33 provides that "All grievances will be logged by Inmate Services". [emphasis added][BS003564.] The County provided no evidence that the grievances are logged, examined, or analyzed, which is accepted correctional practice.

(BS 00176). The narrative of this "kite" is seen in Mr. Benty's medical record. In that same "kite" he said " . . . he did not swing on the other inmate." Two "kites" were sent by Mr. Benty on 5/28/2019 (BS000369) both asking to be moved to avoid an altercation (BS000368). Neither "kite" was addressed by the receiving staff on May 30, 2019 at 1328 hours.

In Mr. Benty's medical record is a more detailed description of his request to move his housing location. The mental health provider noted on May 30, 2019 at 6:37 p.m. in which Mr. Benty said he did not swing at the other inmate, and that he wanted to move out of the pod. [BS000176]

D. Thurkill's and Morgan's Actions

Both Thurkill and Morgan deny that their actions resulted in any harm to Mr. Benty before, during or after the inmate disciplinary hearing late at night on May 30, 2019. They admit to using force against Mr. Benty to meet Thurkill's demand that Mr. Benty stop walking away from the hearing and to keep Mr. Benty from breaking the grip of Morgan, who was "escorting" Mr. Benty back to meet Thurkill's demand, and to gain control of Mr. Benty [BS000375]. They rather suggest that Mr. Benty lost his balance during these defensive tactics by Morgan and Thurkill causing him to be on the floor. Thurkill writes in his use of force report that he used tactics " . . . to redirect Inmate Benty against the wall, left shoulder first." [BS000381] Thurkill in deposition testimony states " . . .I grabbed him [Mr. Benty] and put him up against the wall [Thurkill 300:12-13] and " . . . I take him by his shoulder and push him into the wall literally shoulder first. So his left shoulder hits the wall because I'm on his right." [301: 21-24], and "... I already pushed him into the wall and he sat down." [Thurkill 304:5-6]. Morgan in deposition testimony states that " . . . he [Mr. Benty] landed shoulder first. His left – if I remember correctly, it was his left shoulder that hit first, but he hit the wall sideways to where it was shoulder first . . ." [Morgan 138:15-18]; and when asked how hard Thurkill pushed Benty, Morgan's response was "It was forceful. I mean I can't like rate how hard it was, but it was hard." [Morgan 144:11-13]. Morgan's deposition testimony indicates that Mr. Benty was 3 to 4 feet away from the wall when he was pushed into it [Morgan 145:2]. Further Morgan reports that upon his return to his cell, Mr. Benty asked for medical attention [Morgan 145: 7-8]. Morgan's incident report of May 31, 2019 states that Mr. Benty lost his balance in the struggle with him and

Thurkill and " . . . his left shoulder went into the wall" [BS000375]. Thurkill's incident report states he used a balance displacement defensive tactic to " . . . redirect Inmate Benty against the wall, left shoulder first . . ." [BS00376]. The term "redirect" in jail vernacular means that the inmate was propelled or pushed to a location or position.

Thurkill inaccurately suggests that Mr. Benty's shoulder was injured twenty-four hours prior on May 29, 2019 in an incident with Mr. Felix [Thurkill 304:24]. In this incident, the officer's report states that " . . . I observed inmate Felix 180648 swinging at inmate Benty 132171 in the doorway of the gym area. Benty attempted to swing back however no contact was made." (BS000374) The incident report (BS00374) includes that the inmates " . . . were checked by medic Thomas "2299."

On May 29, 2019 at 2344 hours, an "attending" medical provider (Rita Thomas) reports "Was called to F pod for a fight at approximately 2130 [note it is unclear if she responded at 2130 or the fight was at 2130]. This the second inmate [presumably Mr. Benty] involved. When asked if he required medical attention he refused to answer. There were no visible signs of injury. I accepted his silence as a refusal of care." ([BS00179]. For the record, the incident report notes the alleged fight between Mr. Benty and Mr. Felix occurred at 2211 hours. It should also be noted that Mr. Benty was handcuffed after the incident [BS 000274] with Mr. Felix on May 29, 2019, an action that probably would have revealed pain in Mr. Benty's clavicle or shoulder.

On May 30, 2019, at 12:34 am [presumably this is 34 minutes past midnight on May 30, 2019] medical provider MBOUBEAUX wrote in Mr. Benty's medical record "Checked inmate after being involved in an altercation. Noted left clavicle to have crepitus and deformity. No other injuries noted or complaints. . . STAT x-ray ordered." (BS 00175). On May 31, 2019, an orthopedic consult was ordered due to "fractured collar bone." (BS000169)

An accepted practice in jails, particularly those jails in which uses of force are a concern, is that medical staff must report if medical professionals suspects, or are directly informed by staff or the inmate, that injuries have resulted from a use of force. This is to ensure that uses of force are documented and that inmates involved are medically screened and treated. The fact that the medical record of the incident between Mr. Benty and Thurkill/Morgan is reported as an "altercation" rather than a use of force is very

concerning. [BS00175]. No policy directive mandating medical reporting of suspected or actual inmate injuries from uses of force were provided by the County.

Thurkill's and Morgan's use of force on Mr. Benty was not objectively reasonable (ergo, excessive force), and violated both the policy of the BCJ and the Ohio Jail Minimum Standards (51.20:1-8-13).[49] Butler County jail's policy SMO-01, (Revised January 6, 2016) states that "Use of force shall be limited to instances of justifiable self-defense, prevention of self-inflicted harm, protection of others, prevention of riot, discharge of firearm or other weapon, escape or other crime and controlling or subduing an inmate who refuses to obey a staff command or order." Importantly, Post Orders [sic] ICE-14, Use of Force provides "*In instances where the threat is not immediate and/or the detainee is in an isolated location, the officer shall make every effort to resolve the situation without use of force*."[emphasis added] [BS003614][50]

Based on the totality of the facts there was no need whatsoever to use force against Mr. Benty. Mr. Benty was walking away from Thurkill into Mr. Benty's assigned housing unit and posed no threat to any inmate or staff or to the security of the facility, ("Inmate Benty was about to turn the corner to go through to H2, where he is housed . . . " [BS00376]) When Thurkill "ordered" Morgan to have Mr. Benty to " . . . return to me . . .' [BS00376] there was absolutely no need for force. Mr. Benty was returning to his assigned cell, there was no harm from his decision to leave the disciplinary hearing, and there was no harm or threat to Thurkill or Morgan. Thurkill's demand that Mr. Benty return, " . . . to me . . ." seems to be more about Thurkill's belief that Mr. Benty was "disrespecting" Thurkill, and Thurkill's desire to have the last word. This is evidenced in Morgan's use of force report in which he writes that "Inmate Benty was then informed that any act of disobedience to staff is not tolerated at this jail." [BS000380]. In his use of force report Thurkill writes "I explained to Inmate Benty that he is not allowed to defy the officers of this facility and that he must listen and obey all lawful commands given to him even if he doesn't like them." [BS00381]

---

[49] Policy 5.01 defines "Excessive Force:  Is force that is not objectively reasonable from the perspective of a reasonable officer in the same circumstances.  Excessive Force will not be tolerated." [BS005238].
[50] There is also, for reference, The Butler County Sheriff's Office Policies and Procedures 5.01, Response to Resistance (also known as use of force) and Deadly (Revision date 04-07-2021)

The circumstances surrounding this use of force involving Mr. Benty are repeated by both Thurkill and Morgan in other incidents which are described in this report. This is apparently accepted and condoned behaviors from both these officers, overlooked by their supervisors and jail leadership.

In insisting that Mr. Benty be returned, by force, to an unsurveilled area, where only Thurkill and Morgan were present, Thurkill escalated the incident in which Mr. Benty was ultimately subjected to excessive force and sustained permanent injuries, and for no articulable purpose consistent with policy or law.

E. Allegations of Racial Slurs, Intentional Infliction of Emotional Distress, Aiding and Abetting Unlawful Race-Based Discrimination

Mr. Benty's complaint states that both Thurkill and Morgan used racial slurs such as, "I'll knock your gold teeth out you fucking nigger" (Morgan) and "I will knock your gold teeth out." (Thurkill) during their assault of Mr. Benty.

In Thurkill's "Answers to Plaintiff's First Set of Interrogatories", February 18, 2022, he responds to whether or not he made reference to Mr. Benty's gold teeth in this way, that the disciplinary hearing on May 30, 2019 was due to " . . . Plaintiff's ticket [disciplinary notice] for almost getting his teeth knocked out by Inmate Felix, and denies making any comments about "gold" teeth.[51] In Morgan's response in Defendant Jeremiah Morgan's Answers to Plaintiff's First Set of Interrogatories", February 18, 2022, "Mr. Morgan states heard Sgt. Thurkill make a comment along the lines of being there ([Plaintiff's disciplinary hearing] to address Plaintiff's ticket for almost getting his teeth knocked out by Inmate Felix."[52]

Neither Thurkill's nor Morgan's reports, incident reports (BS00375, 00376) make any reference to any conversation with Mr. Benty regarding teeth. Neither Thurkill's nor Morgan's use of force reports (BS00378-00387) include any references to a conversation regarding teeth. In this deposition testimony Thurkill acknowledges that there is no narrative statement about "teeth" [Thurkill 309:3], and that Thurkill didn't recall whether

---

[51] See also Defendant Joel Thurkill's Response to Plaintiff's First Set of Requests for Admission, February 18 2022, page 7.

[52] See also Defendant Jeremiah Morgan's Response to Plaintiff's First Set of Requests for Admission, February 18, 2022, page 7.

he had talked about the "teeth" comment in any subsequent investigation [Thurkill 309: 3-9]

In Thurkill's deposition testimony, in response to a question regarding whether it was Mr. Benty who was threatening to ". . . knock someone's teeth out," Thurkill responded, "If anybody was, it was him." [Thurkill 308:11-13]  Thurkill apparently concludes that Mr. Benty's comments about "teeth" are related to Mr. Benty's possible anger at the other person involved (Mr. Felix) [Thurkill 307:8-13].

In Morgan's deposition testimony, he cannot recall any conversation about "teeth" during Mr. Benty's disciplinary hearing. [Morgan 132:16-20, 156:2-10].  Morgan denies using a racial slur and denies he told Benty he'd knock his teeth out. [Morgan 155: 17-24].

There are inconsistencies between both Morgan and Thurkill's responses in February 2022 interrogatories about "teeth", "gold teeth", and racial slurs, and their differing recollections during their depositions in April 2022.  There is no reference in their incident reports or use of force reports regarding the "teeth" remarks or racial slurs Thurkill and Morgan endorsed in February 2022.   This is a considerable credibility barrier for both Thurkill and Morgan at best, and damning to the internal operational practices, supervision, including investigations, of the Butler County Sheriff's Office.

As seen throughout this report, both Thurkill and Morgan fail to be forthcoming in their deposition and interrogatory testimony, and their reports about the incident have no detail about "teeth".  There are discrepancies in the testimony of Thurkill and Morgan.  Their explanation that any remarks about "teeth" were Thurkill remarking that Mr. Benty was lucky not to have his teeth knocked out in the previous day's "altercation" with Felix is hollow.  Thurkill and Morgan have a credibility problem.

F.  Care of Inmates with Mental Illness

Forty-four percent (44%) of jail inmates in the United States have a history of mental illness and 26% were experiencing serious psychological distress at the time they were incarcerated.[53]   In the state of Ohio, it was estimated that 63% of jail inmates had a

---

[53] Bronson, Jennifer Ph.D., and Marcus Berzofsky, Dr. P.H., Indicators of Mental Health Problems Reported by Prisoners and Jail Inmates 2011-12, U. S. Department of Justice, Bureau of Justice Statistics, June 2017 https://www.bjs.gov/content/pub/pdf/imhprpji1112.pdf

"mental health problem."[54]  Jails are acknowledged as the largest provider of mental health services in most communities across the United States.  This brings specific responsibilities to jails and corrections staff to know about, understand, and manage inmates with mental illness.  There is a substantial body of work providing resources and recommendations to jails, including in Ohio, that address inmate classification, housing, programs, disciplinary procedures, and interpersonal communications.[55]

Mr. Benty was a person with a diagnosed mental illness.  When Mr. Benty's was summoned to appear before Thurkill and Morgan on May 30, 2019, he had a documented history of mental illness while in the facility.  Morgan, in his deposition testimony reports that F-Pod and H-Pod were " . . . both psychiatric units . . ." noting that force was " . . .  more prone to happen there." [Morgan 107:2-5].   Knowing that inmates with mental illness were housed in these PODs provides an even more disturbing picture of how the Butler County Jail operated in terms of management of these inmates with mental illness.

Thurkill, according to his training records [BS000794-000796] prior to this use of force involving Mr. Benty had received a total of four hours in two different trainings regarding suicide prevention (July 14, 2018 and December 3, 2019) a total of 2 hours of training regarding "mental health indicators" on January 9 2019, and 2 hours of crisis intervention training on January 9, 2019.   None of this training is documented in terms of what was instructed (e. g. a lesson plan) or if Thurkill demonstrated knowledge gained.  Morgan's training record [BS000708-709] documents that, prior to the incident with Mr. Benty, he had 2 hours of crisis intervention training and 2 hours of "mental health indicators" on April 4, 2019.  As with Thurkill there is no documentation of the content of the training or if Morgan demonstrated any proficiency or knowledge gained.

Mr. Benty's presentation during the disciplinary hearing, by the officers' own descriptions in their incident reports was " . . . agitated . . . stating he didn't have to listen to Sgt. Thurkill" and was "very argumentative",  [BS000380–381], "yelling and cursing" [Thurkill 289:10], interrupting Thurkill (Morgan 129:8) should have signaled to a trained

[54] https://www.ocjs.ohio.gov/links/ocjs_MentalHealthProblemsofPrisonandJailInmates.pdf
[55] For example, no cost resources include: https://nicic.gov/projects/people-mental-health-conditions-in-corrections, https://www.samhsa.gov/resource-search/ebp and in Ohio https://www.ocjs.ohio.gov/links/ocjs_MentalHealthProblemsofPrisonandJailInmates.pdf

correctional officer that this behavior may well be a manifestation of Mr. Benty's diagnosed mental illnesses. As Thurkill and Morgan had recently received training regarding "mental health indicators" and "crisis intervention" perhaps that might have guided their response. As noted elsewhere in this report, Thurkill's and Morgan's use of force was not objectively reasonable given agency policy and the absence of any threat, so failing to consider Mr. Benty's mental health status also marks another deficit in their response.

## VII.    Investigations of Uses of Force in the Butler County Jail and the Investigation Involving the Use of Force and Mr. Benty

The Butler County Sheriff's Office procedures to investigate uses of force in the jail are wholly inadequate, resulting in harm to inmates. For this report, I examined 25 uses of force in 2018 and 2019 (277 in 2018 and 251 in 2019), a relatively small percentage of all the uses of force, but nonetheless a representative sample. What this sample clearly demonstrates are egregious uses of force, certainly not within the boundaries of any reasonable policies, but more importantly, an absolute absence of any oversight or questions from the Sheriff's Office jail commanders (or anyone else) regarding these incidents. That adds up to an organization that tolerates, and thereby condones and encourages, violence by taking no action on these incidents. I can't really overstate how outrageous some of these use of force were, through the County's own reporting, and how jail and Sheriff's Office leadership is effectively enabling this illegal conduct.

I also note that the use of force reporting as documented on incident reports is generally vague, lacking in detail, and in some reports, misleading. There is insufficient justification provided for uses of force, and supervisors and leaders who sign off on the reports apparently did not question the absence of specifics. Other than the lack of importance placed on uses of force by the Buter County jail leadership, one reason for these poor reports may well be the training received by employees. In his deposition testimony, Thurkill responds that his training instructed him to create written records that limit liability against Butler County. (Thurkill 88:10-12, 16, 89:18, 20). What I conclude from those deliberative statements is that information about uses of force and other areas where an officer has been trained to recognize potential liability for Butler County will be written in such a way to minimize that potential liability and be very vague on details.

A cursory review of the use of force logs for 2018 – 2021 reveals a troubling pattern of the same names appearing many times. This finding goes directly to the discussion in this report of the lack of any early warning system to flag potentially problem officers, such as Thurkill and Morgan, and to intervene to protect inmates, such as Mr. Benty, from harm.

Because of the focus on use of force in jails for more than two decades, many jails have implemented *early warning systems* to routinely provide leadership with the names of employees involved in uses of force.[56] This is a resource of contemporary law enforcement that should have been known by the County and by the Sheriff. An early warning system examines if the officer's use of force is consistent with policy, whether their involvement is because of assignment to specialized teams in the jail, whether they worked in high risk areas such as a jail mental health unit, or whether they are potentially problem officers. An examination of the Butler County Sheriff's Office, Table of Contents of Policies and Procedures reveals no such program in the Sheriff's Office.

The other document(s) that would reveal issues with and perhaps identify the magnitude of uses of force in this jail are:

- The inmate grievance log, referenced in HOU-33, "All grievances will be logged by Inmate Services." [BS003564]. This is critical information for the County, the Sheriff, and jail administrators. Failing to produce this document suggests that the internal policy is not followed.

- Medical reports generated from inmate injuries would also provide information, if the medical staff were aware the incident was a use of force rather than an altercation. In Mr. Benty's case, the record inaccurately reports that the medical response was due to an altercation, not a use of force. [BS000175].

- Employee worker compensation records would reveal the number of times employees are injured as a result of uses of force, or stopping inmate/inmate altercations. My experience is that while not all uses of force may be reported, employees almost always file worker's compensation reports if they are injured.

---

[56] For example see Samuel Walker, Geoffrey P. Alpert and Dennis J. Kenney, Early Warning Systems: Responding to the Problem Police Officer, U. S. Dept. of Justice, Office of Justice Programs, National Institute of Justice, July 2001 [emphasis added] https://www.ojp.gov/pdffiles1/nij/188565.pdf

- Complaint records not provided. Internal Affairs policy, 2.08 "The Butler County Sheriff's Office shall maintain a record of all complaints against the office and/or its employees. These records shall be maintained in a locked file cabinet in the Criminal Investigations Division. Records involving complaints determined to be unfounded as well as all other records will be maintained for any possible future civil litigation for a minimum period of two (2) years, and / or in accordance with the records retention schedule." [BS003069]

- Complaint records - Internal Affairs policy, 2.08 "The administration monitors complaints against employees and may direct the compilation of statistical summaries or reports to assist in their oversight responsibilities. This report may be provided to command officers, supervisory personnel, officers, or the public at the discretion of the Sheriff. Trends or patterns of complaints may indicate the need for officer assistance, discipline, remedial training, changes to department policies and procedures, or methods of operation." [BS003069-003069]

  - Although the County provided reported Corrections Use of Force logs for 2018-2020 [BS003616-003665] the utility of these logs to evaluate uses of force is practically nil. The log for the year in question in this case, 2019 for the 257 uses of force listed, does not provide the name(s) of the involved inmate(s), the names of <u>all</u> the involved employee(s), the location, time of day, day of week, the supervisor who reviewed the use of force, or type of force used. There is no analysis of this information provided by the County.

None of these documents identified above, other than the logs, were produced by the County. I conclude that either these documents do not exist or that the data is not maintained for incidents occurring in the County's jail. These records, documentation of review of these records, and descriptions of remedies or corrective actions are missing, a glaring lack of professionalism and transparency, and a substantial deviation from accepted practices in law enforcement and corrections. As noted previously in this report, the County and the Sheriff evidence no concern about the uses of force and excessive uses of force in the jails.

Neither the policies and procedures of the Butler County Sheriff's Office nor the policies (post orders) for the jail require or reference assessment, trending, analysis, or actions regarding uses of force in the jail.  This is a substantial leadership dereliction of duty in terms of the County's obligation to ensure uses of force comply with all relevant requirements, case law, state minimum standards, and agency policy itself.   In fact, if the County doesn't know and takes no responsibility to learn about uses of force, then no corrective actions can then be taken.

Looking at the record of uses of force in Corrections from 2018 – 2021:

- 2018 – 277[57]
- 2019 – 257 [BS003625 – 003632]
- 2020 – 342
- 2021 – 219

For the subject year of 2019, the summary/log of data notes only the incident number, the reported date, and employee last name.[58]  If other employees were involved, their names are not listed, making for an incomplete record.  Nonetheless, Morgan's name is included on the list twelve times, and Thurkill's name is included on the list three times. It can be anticipated that officers would be involved in more uses of force than supervisors (e. g. Morgan and Thurkill) as officers are the first line of intervention. The listing does not serve as an analysis of the uses of force and of whether, for example, these uses of force were consistent with agency policy, inmates or staff were injured, etc.   Importantly, the County provides no analysis, or report, or assessment of uses of force in the jail to conform to the requirements of Policy 5.01, and policy SGT-15, as noted above.

In July of 2019, Lt. Fisher forwarded an "Internal Investigation" to Major Craft which apparently had been initiated by an "unsigned letter from an inmate claiming inappropriate use of force by Sgt. Thurkill.  The return sender information on the envelope said Maurcio Bently[sic]." [BS001256].  Lt. Fisher, in his deposition testimony, noted that an anonymous

---

[57] In the use of force data provided for 2018, Thurkill's name is noted eight times, although he was involved in at least ten incidents.  This suggests that if more than one officer is involved in a use of force, only one officer's name was recorded, making accurate recordkeeping potentially inaccurate.
[58] For 2020 and 2021, the documents the County provided listing all the uses of force in Corrections are not searchable by date, as the date is excluded from the data file provided but by name of officer and incident number.

letter was sent to him, and had Benty's return address on the envelope. The letter is provided by the County [BS001287-001289] and the envelope is provided at [BS001069], which indicates a return address in the City of Hamilton as Mauricio Benty.[59]

Lt. Fisher then "re-examined" the use of force involving Mr. Benty and Thurkill. In Lt. Fisher's interview of Thurkill on July 11, 2019, Thurkill confirmed that force was used on Mr. Benty because Mr. Benty walked out of the disciplinary hearing and Thurkill "ordered " him back and Mr. Benty failed to comply with that order, thus resulting in the force. Thurkill said he "directed" Mr. Benty to the wall, and "That is where it is suspected that the injury to the collarbone occurred." [BS001257]

Lt. Fisher also interviewed Morgan on July 11, 2019. Morgan " . . . described Bently [sic] as being uncooperative and disrepectful, failing to follow simple orders and when he [Morgan] attempted to bring him back to the hearing, he [Benty] forcefully pulled away from him and that is when Thurkill *assisted* him [Benty] in regaining control by placing him [Benty] on the wall." [BS001257] [emphasis added].

Lt. Fisher concludes that the " . . . force was used in accordance to policy and procedure." [BS001257]

The discrepancies in the initial incident reports, use of force reports, and in these interviews are:

- Thurkill acknowledged for the first time in the interview with Fisher that Mr. Benty's injury might have been the result of Thurkill's "directing" Mr. Benty to the wall.

- Morgan acknowledged that it was Thurkill who "assisted" Mr. Benty by placing him against the wall, as contrasted with Morgan's incident report in which he wrote that Mr. Benty "lost his balance" and his left shoulder went into the fall first. [000380]

Presumably Lt. Fisher is familiar with the physical layout of the jail, but never asks where Benty was going when he walked away from the hearing, or why it was imperative that Thurkill's and Morgan's view, Mr. Benty must return to the hearing? Lt. Fisher never asked

---

[59] In his deposition testimony Mr. Benty reports he did not write the letter, but knows the name of the inmate who did. Mr. Benty denies asking the inmate to write the letter for him. Benty 69:24, 70:1 -14

if Thurkill and Morgan attempted to deescalate the situation.  Lt. Fisher does not have the benefit of 2022 responses by both Thurkill and Morgan to interrogatories or of their deposition testimony, which makes even clearer their disingenuous actions and inaccurate reporting on the use of force.

Lt. Fisher's deposition testimony reveals that the "investigation" into the use of force involving Mr. Benty was entirely superficial and inadequate.  Lt. Fisher says that he looked at the narratives of the incident.  But Lt. Fisher:

- acknowledges that he only interviewed Thurkill and Morgan,
- didn't identify any other possible inmate witnesses (which he determined by looking at grievances from inmates who might have volunteered they witnessed the use of force),
- considered Mr. Benty's "kite" of June 4th suitable admission of his guilt for being "argumentative" during the hearing, [BS000360]
- didn't review the inmate roster from the date in question,
- didn't ask the level of force Thurkill used,
- didn't ask how far away from the wall Mr. Benty was when Thurkill used "balance displacement" to push Mr. Benty into the wall,
- didn't ask if any staff other than Morgan and Thurkill were present or might have observed the incident,
- didn't ask Thurkill when he found out about Mr. Benty's injury, and
- did not interview Mr. Benty.

Lt. Fisher's interview with Morgan followed the same pattern – asking the officer to describe the situation, and asking no questions.   He did add that he doesn't recall if he asked Morgan if Morgan attempted to deescalate the situation.  Lt. Fisher's deposition testimony suggests that  he was unclear about what precipitated the incident.  [Fisher 26:1 – 40:25]

Importantly and significantly, the Butler County Sheriff's Office and the jail never looked into this use of force until a letter was received in July.  There apparently is no credible process for routinely assessing uses of force **even when those uses of force result in injuries requiring transport to a hospital**, or for asking questions about the

necessity of the force or asking what alternatives were considered. In any use of force involving an inmate injury, a jail must fully investigate to determine the veracity of the officers involved and to prevent future harm – as well as achieve the objectives noted in Policy 5.01. [emphasis added]

The totality of this County's, the Sheriff's, and the jail's apparent indifference to uses of force, discrepancies in reporting, application of policy (if a clear policy exists), absence of thorough and objective investigation, and disregard of the discrepancies in reporting narratives and the outcomes (in this case a broken clavicle), present the ingredients for a dangerous jail in which policy and accountability are not important. This organizational culture, absence of leadership, and inconsistency in daily operations presents danger to inmates such as Mr. Benty.

## VIII.    Employees' Personnel Files, History of Employment

This review assesses if the job-related personnel histories of Thurkill and Morgan reveal that the County and the Sheriff were on notice about their behaviors, specifically related to uses of force.

### A. Thurkill's Employment History and Uses of Force

Thurkill was hired on July 16, 2007 and promoted to Sergeant on June 5, 2018. His personnel file notes that he had excellent attendance and received several commendations for his work.[60]   Thurkill, in his deposition, reports that during his employment with the Hamilton County (Ohio) Jail he was investigated for excessive use of force " . . . a couple of times." [Thurkill 16"10-15]. Thurkill also admits that he has been investigated " . . several times" for inmate abuse while working in the Butler County Jail [Thurkill 172:18]. He does not recall a specific number, though, and does not recall the number of times he was served with investigatory paperwork [Thurkill 174:3], although he guesses fewer than 12 times

---

[60] February 7, 2008 – commendation for finding evidence of fire. September 4, 2008 – selected to attend Peace Officer Academy April 9, 2009 – thanks for assistance at Butler County Job Fair January 11, 2011 – recognition for exceptional attendance January 15, 2013 – recognition for exceptional attendance January 30, 2014 - recognition for exceptional attendance  January 16, 2015 - recognition for exceptional attendance January 20, 2016 - recognition for exceptional attendance January 12, 2017 - recognition for exceptional attendance January 9, 2018 - recognition for exceptional attendance January 10, 2018 - recognition for exceptional attendance June 5, 2018 – notification of successfully passing the Corrections Sergeant Examination. January 1, 2020 – thanks for assisting with jail kitchen staff didn't come to work January 10, 2020 - recognition for exceptional attendance January 11, 2021 - recognition for exceptional attendance.

[Thurkill 174:17]. While I am unsure if all the County's records regarding the total number of times Thurkill was the subject of a use of force investigations were provided, the records available indicated Thurkill was involved in 20 uses of force between 2016 and 2019.

I conclude from my assessment of the uses of force reported involving Thurkill that Thurkill used force too often, and in actions that are not supportable by agency policy or credible penological reasons. Thurkill used force, or was involved in uses of force, on the following number of occasions between 2016 and 2019:

- 2016 – 4 incidents
- 2017 – 4 incidents
- 2018 – 9 incidents
- 2019 – 3 incidents

Although these number, particularly in 2018, are concerning, the circumstances in themselves or should have raised significant red flags for the County, the Sheriff, and jail's leadership. Specifically, the pattern that emerged is that Thurkill used force against inmates whom he perceived as disrepectful or as failing to obey his orders rather than legitimate uses of force to protect himself, his colleagues, facility security, or inmates. These circumstances, described below, should have been red flags to any supervisor or manager who was reviewing the incident. Yet as evidenced by their signing off without comment – this level of use of force/excessive use of force was of no concern [except for one incident for which I cannot locate an employee disciplinary outcome.]

In Thurkill's deposition testimony, he reported an incident where his wife called police to their home because he was having an "episode" related to experiences during his deployment with the U. S. Army Reserve in Iraq. He reports that noises trigger his reactions, and in one instance he states then when he heard a loud noise, " . . . I curled up in a corner after knocking past a light shade." [Thurkill 62:3-4]. Although Thurkill was not clear about the dates, his deployment to Iraq was for ten or eleven months in 2011. [Thurkill 26:17, 57:10, 62:19, 23 [BS001307 – 1309]. The responding police took Thurkill to the local VA. Given the dates of deployment, this incident probably occurred in 2012 or 2013.

National attention was focused on combat veterans returning to or seeking law enforcement positions, because of the recognition of Post-Traumatic Stress Disorder (PTSD) and traumatic brain injuries.

> "One common illness that follows a traumatic event such as combat is PTSD. The influence of PTSD on returning veterans' civilian lives is well documented. With symptoms such as anxiety attacks, depression, nightmares, aggressive behavior, flashbacks, sensitivity to noises and movement, and a numbing of emotions, PTSD can cause problems for veterans making it difficult to get along with family and friends, function on the job, or transition back to civilian life. If untreated, invisible injuries can lead to an onslaught of problems including domestic violence, alcoholism, and even suicide. Rates of each run high among veterans compared to the civilian population.
>
> In addition to PTSD, several other behavioral issues are common, such as:
> - Attendance problems/frequent use of sick leave
> - Difficulty passing fitness-for-duty tests
> - **Inappropriate use of force [Emphasis added]**
> - Domestic disturbances/violence"[61]

Most law enforcement organizations, following national recommendations, require employees to immediately report their off-duty conduct related to incidents such as domestic violence, driving infractions, particularly driving infractions related to driving under the influence of drugs or alcohol, and arrests for misdemeanors and felonies.

The Butler County Sheriff's Office policy 2.05, Cannons of Police Ethics, fails to establish any duty to report off-duty conduct. Other than stating in Article 6. Private Conduct that "The community and the service require that the law enforcement officer lead the life of a decent and honorable man" [BS003057] no other direction is given. Policy 2.04, Policies and Procedures also provides no duty to report off-duty conduct, while providing a list of what officers are allowed and not allowed to do [BS003054-003055].

It is disturbing that there is nothing in Butler County Sheriff's Office Policy requiring the agency to be notified of such an employee's mental health crisis; nor is there anything

---

[61] International Association of Chiefs of Police, Employing Returning Combat Veterans as Law Enforcement Officers, September 2009, https://www.theiacp.org/projects/employing-returning-combat-veterans-as-law-enforcement-officers accessed July 7, 2022, page 16.

in Thurkill's personnel file about the "episode".  While all agencies want to support their employees who are returning combat veterans, the field has recognized that there are challenges to these veterans, their families, and their agencies.  This has been widely discussed, except perhaps in Butler County.  The International Association of Chiefs of Police has published many guides for agencies, families and veterans which highlight that agencies need to be attentive to signs and symptoms associated with combat and PTSD and take action to help their employees.[62]  While not attributing causation of Thurkill's uses of force to his experiences during his deployment, this circumstance highlights a clear gap in the County's and the Sheriff's policies and procedures regarding employees experiencing any mental health crises, veterans or not, and their interventions and assistance to them.[63] This lack of policy along with the absence of any quantitative evaluations of uses of force by employees exacerbates the matter for inmates such as Mr. Benty.

This is a summary of the uses of force for Thurkill from the records provided by the County.

- June 6, 2016 - narrative not provided. UOF 00062
- June 6, 2016 - narrative not provided. UOF 0052
- August 26, 2016 - narrative not provided.
- December 29, 2016 -narrative not provided.
- April 8, 2017 - narrative not provided.
- April 27, 2017- narrative not provided.
- September 15, 2017 - narrative not provided.
- December 19, 2017 – narrative not provided.

---

[62] Law Enforcement Leader's Guide on Combat Veterans:  A Transition Guide for Veterans Beginning or Continuing Careers in Law Enforcement https://www.theiacp.org/sites/default/files/2018-08/LeadersGuide_300dpi.pdf Page 13.
[63] This matter is also relevant as the standards of the Prison Rape Elimination Act of 2003, 115.17 (3) (e) "The agency shall either conduct criminal background records checks at least every five years of current employees and contractors who may have contact with inmates or have in place a system for otherwise capturing such information for current employees."
https://www.prearesourcecenter.org/implementation/prea-standards/prisons-and-jail-standards  The Buter County jail underwent a PREA audit in 2014 in which the auditor found compliance with this section. The County did not provide a policy relating to this provision. The relevant jail policy was not provided. https://www.butlersheriff.org/corrections/butler-county-jail-prea/  Butler County Sheriff's Office Post Orders[sic] – PRA (unnumbered) on page 3, provide there are checks per the standard. [BS003490]

- February 27, 2018 – Inmate wanted to file assault charges against Thurkill; allegations from a corrections officer that Thurkill followed inmate into inmate's cell and the officer heard " . . . what sounded like a smack" before Thurkill exited the cell [BS001883]. Corrections officer said inmate told her immediately that Thurkill had hit him in the side of the head, and the officer observed a red mark on the inmate's face. Thurkill's report [001890-91] was that the inmate threatened to get Thurkill fired, and "I responded to the cell, placed inmate in the escort position and guided him to the wall and ordered him not to move. . . I informed him that he will not threaten officers . . . " Thurkill's investigative testimony was that he placed the inmate in an "escort position" and " . . . guided him to the wall and ordered him not to move" [BS001884] after Thurkill said the inmate threatened him. When asked how hard he guided the inmate into the wall, Thurkill " . . . stated he was not gentle about it." But Thurkill denied he hit or struck the inmate. Thurkill justified placing the inmate in an "escort position" for " . . . threatening to get him fired." [BS001885]. The former inmate's testimony to agency investigators was that Thurkill " . . . slapped him on the left side of the face . . ." [BS001886]. An inmate in the cell at the time also heard a slap. [BS01887]. This appears to be a more extensive review, but I was unable to determine the outcome in terms of founded, or not, and if founded any disciplinary action or remedial training. In any event, in my opinion, an inmate verbally threatening to have an officer fired (assuming this is what happened) does not justify the use of *any* force, let alone the excessive force alleged in this instance. It is more of a bruised-ego situation than a real provocation. This is another indication of lack of training of employees to manage inmates appropriately and respectfully.
- March 8, 2018 – use of force, Thurkill ordered an angry inmate to give him back a book that another officer gave to the inmate, after Thurkill told the inmate he'd have to wait. Thurkill opened the cell door and used defensive tactics to retrieve the book. Inmate (Wirtz) claimed Thurkill assaulted him. [BS00608-609]. Supervisors (four of five signing off) found use of force within policy (signatures illegible, no dates). In my opinion, this was no reason for this use of force to have taken place –

just to retrieve a book that Thurkill told an inmate he couldn't have until later. No reason at all. This use of force was about the inmate getting something from another officer that Thurkill had refused. This was clearly an avoidable use of force, for no objective reason.

- March 20, 2018 – use of force, Thurkill assisted by securing ankle straps to inmate after Hoffman, Blanton, Schultz used pepper spray, twice, when inmate [Riber] refused to obey an order to get on the floor in his cell to be handcuffed. Taser also deployed, twice. While placing inmate in a restraint chair, inmate continued to resist, and Thurkill deployed Taser again. Inmate received cut to head; and was then taken to the <u>hospital for evaluation</u>. [emphasis added] CO Blanton reports that inmate was having a seizure , and medical staff needed to administer an injection. Inmate was behaving erratically. Supervisors all found use of force within policy (four of five, one missing) (signatures illegible, no dates). Note that the use of this much spray and Taser on an inmate in medical distress is troubling and there is no reason provided why this inmate had to transported to the hospital after this use of force. The discrepancies in the reporting alone would warrant a closer review, along with the head injury. [BS00612-00614]

- March 30, 2018 – Thurkill's name noted on the use of force log, but no details provided. [BS003617]

- April 18, 2018 – After ordering an inmate not to move from a location, and the inmate slightly moved, Thurkill placed the inmate against the wall and " . . . his head came into contact with the wall rather hard." Thurkill informed a supervisor that " . . . Inmate Tucker had hit his head on the wall." [BS00617-00618]. Four supervisors signed off on Thurkill's report as within in policy, even with the glaring discrepancy of how the inmate's head came into contact with the wall. As noted elsewhere in my report, this is evidence of an absolute lack of management/leadership interest in examining uses of force, and, in this case, the matter didn't require a lengthy investigation to conclude there were violations of policy and lack of truthfulness by the reporting employee. Thurkill again places an inmate against a wall.

- May 11, 2018 – Female inmate resisted handcuffing, taken to the floor, struck on the face by staff (twice). Thurkill's very vague description of the incident was that he " . . . assisted Officer Caudill in controlling and subduing …" the inmate. [BS000621-622]. This inmate was 5'1" tall, yet no supervisor asked questions about why three staff were needed to 'subdue' her and how she came to be hit twice in the face. Supervisors (four of five signing off) found use of force within policy (signatures illegible, no dates)

- May 17, 2018 – Thurkill assisting in the intake area of the jail in an incident apparently involving in a takedown of an inmate who was verbally aggressive and non-compliant. Supervisors (four of five signing off) found use of force within policy (signatures illegible, no dates). [BS00626-00628]

- May 22, 2018 – An inmate refused to enter a cell as ordered. Thurkill came from the officer's work podium, responded into the cell and gained control of inmate and " . . . placed him against the back wall of the cell." Inmate claims he was assaulted by Thurkill. Supervisors (four of five signing off) found use of force within policy (signatures illegible, no dates). No one asks why Thurkill responded to a hostile inmate before asking for, or waiting, for backup. The inmate's refusal to enter a cell did not, based on Thurkill's narrative, pose a threat to the inmate or the housing unit, and waiting for back-up would be consistent with accepted correctional practice. Supervisors (four of five signing off) found use of force within policy (signatures illegible, no dates) [BS000631-000632]

- May 25, 2018 - An inmate refused to retrieve his identifying wrist band from his cell during dinner service. Thurkill "ordered" the inmate several times to go to his cell and get his wrist band, and after the inmate refused, Thurkill placed the inmate in an "escort" position and took him to his cell. Once in the cell, according to Thurkill the inmate turned toward Thurkill and Thurkill struck the inmate on his nose and chin, bringing blood. At that time, Thurkill radioed for backup. Supervisors (four of five signing off) found use of force within policy (signatures illegible, no dates) [BS000635-000637]. There was no imminent harm before Thurkill escalated the situation. Thurkill, based on the totality of his own reporting, appears to have a

trigger for force when inmates are disrespectful or don't follow his instructions, even regarding inconsequential matters, or when they ignore or confront him.

- November 7, 2018 – Thurkill was assisting with inmates in the receiving area who had been fighting and when one of the inmates would not be seated to have his handcuffs moved from front to back. The uncooperative inmate was taken to the floor by other officers, and then Thurkill deployed his Taser, <u>three times</u>, and the inmate was then placed in a restraint chair. Supervisors (four of five signing off) found use of force within policy (signatures illegible, no dates) [BS00641-00643]. [emphasis added] Inmate admitted to being under the influence of meth. No supervisor asks why staff was unable to restrain the inmate, or why a Taser was used three times when the inmate was on the floor.

- May 27, 2019 – An inmate was being screened because of a prior use of force and was uncooperative. Thurkill's memo suggests he was not involved in using force; and inmate was taken to the <u>hospital</u> for medical treatment. [emphasis added].

- May 27, 2019 – use of force incident involving Mr. Benty. Thurkill given notice of investigation.

- July 17, 2019 – Female inmate on suicide watch (presumably with mental illness) would not stop banging on her cell door. Several staff, including Thurkill, tried to "deescalate", using unreported techniques/language, and Thurkill gave the order to remove her from her cell to a restraint chair; inmate resisted, and Thurkill applied "mandible" pressure point to gain compliance. Supervisors (four of five signing off) found use of force within policy (signatures illegible, no dates) [BS000684-000686].

- June 8, 2020 – Intoxicated inmate whose behavior was combative was brought into processing/booking. Thurkill placed him on a wall for searching; removed handcuffs for searching against a wall; inmate was taken to the floor; continued to resist; used pepper spray (twice); and placed in restraint chair. Supervisors (four of five signing off) found use of force within policy (signatures illegible, no dates) [000698-000701] No one questions whether considering deploying a Taser and pepper spray against a highly intoxicated person is an acceptable tactic. No one questions why an intoxicated arrestee who is combative should have had his

handcuffs removed for processing, or whether processing should have been deferred until a time when the inmate was under control.

- October 20, 2020 – Two inmates (Bayong, Adem) alleged they were beaten with handcuffs on, allege racial slurs, along with other incidents during their incarceration. One incident involved Thurkill when he conducted a disciplinary hearing in which Bayong alleges Thurkill said they had no rights and " . . . should just go back to [their] country." [BS001299] Bayong lost a tooth and a dentist reported trauma [BS001361] and investigator concluded no wrongdoing on the part of any Butler County officers.

  - Of relevance to Thurkill's excessive use of force involving Mr. Benty, is that Mr. Bayong, who was involved in this October 20, 2019 incident, which is currently the subject of litigation, alleged that Thurkill made " . . . references to broken collarbones . . . " during their confrontation. [BS 000694]. It seems a very unusual coicidence that such a report is made by an inmate, six months *after* Mr. Benty's injury was sustained.

- July 9, 2021 – was assisting with dressing out an inmate who was resisting, struggling to remove and replace a uniform; inmate was ultimately directed to a cell to wait for medical for a bleeding lip; and threatened to kill Thurkill. Supervisors (four of five signing off) found use of force within policy (signatures illegible, no dates) [BS000703-000707]. No one questions if there were the appropriate number of staff to assist to avoid force, or if waiting would have deescalated the situation. Although Thurkill directs staff to retrieve a video camera, there is no mention if there was a recording, or what happened to the recording.

This is a disturbing litany of uses of force that fail to meet County's definition for acceptable use of force. These responses and tactics used by Thurkill alarmingly exhibit the same *modus operandi* Thurkill used against Mr. Benty i.e., inflicting injury to an inmate's head or shoulder through a "takedown" or by forcefully "guiding" an inmate into a wall, frequently followed by a blow to the head or face. In most if not all of these incidents there was no danger to the officer, no danger to other inmates, and no danger to the inmate him/herself. Instead, these were circumstances in which Thurkill's was moved to action by

an inmate's refusal to do what he, Thurkill, said, and in fact Thurkill escalated rather than de-escalated the incident. It appears to me it is more about who has the "power" and disrespect for inmates, especially the 66% of inmates in Ohio's jails with mental illness. These cases also reveal a disturbing tendency among supervisors (who are for the most part unidentified) to "rubber-stamp" officers' behavior with no real inquiry or assessment.

B. Morgan's Employment History and Uses of Force

Jeremiah Morgan began his employment with the Butler County Sheriff's Office on March 11, 2019 and resigned on March 26, 2021. He completed Corrections Officer Basic Training in 2017 while employed by the Hamilton County (Ohio) Sheriff's Office.

From March 11, 2019 to the end of 2019 (ten months), Morgan is reported to have used force an astonishing fourteen (14) times. When asked during his deposition in April 2022 how many times he had used force during his time at the Butler County Jail, Morgan at first could not recall the number of times, but stated " . . . I've used force a few times." [Morgan 106:23-25, 107:1-9] Between 2020 and his resignation, he used force another eight times. [BS000579-000606].

In total Morgan used force a reported twenty-three times, at least during the twenty-four months of his employment in the Butler County jail, but was unable to recall (or was unwilling in his deposition to acknowledge) this information. And, as noted below, some of these uses of force are memorable for their level of violence.

I find Morgan's inability to remember that he had used force fourteen (14) times in the first ten months of his employment with the Butler County Jail in 2019 to be literally unbelievable. This demonstrates not only a lack of candor on Morgan's part but also no accountability for individual employees and their supervisors, not to mention leadership's indifference to the level of violence. It also points to the fact that violence and uses of force were normalized in this jail and accepted, and even expected, by the jail's leadership.

Below, I examine the uses of force in 2019 which are very troubling in terms of the application of inappropriate use of tactics. But much more troubling is the fact that 13 of the 14 reported uses of force in 2019 raised no issues for the command staff of the Sheriff's Office.

During his two-year tenure with the Sheriff's Office Morgan was investigated for a use of force regarding Mr. Benty [BS001063-64] (May 2019), and was involved in uses of force and other incidents as follows, to the end of 2019:

- May 2, 2019 responded to an inmate who was threatening self-harm; and in an effort to remove the inmate to suicide watch, did a takedown. Five supervisors signed off on this use of force with mostly illegible signature and no dates. No one asked if there was any attempt at de-escalation or asking for assistance from other officers to mitigate force. [BS00540-541]

- May 27, 2019 taking down an inmate, subduing him and placing him in handcuffs; three supervisors reviewed the report and found the use of force within policy, although no supervisor asked why an inmate remained in his cell during a shakedown [e.g. search for contraband]; or was unrestrained allowing the inmate to "escape" from the officers [BS001054]

- June 3, 2019 regarding an inmate allegation of failure to protect him [BS001073] an investigation which found he and his colleagues acted appropriately, although the investigation failed to address the larger issue of inmate classification and separation of inmates.

- July 2, 2019 notified that a female inmate was kicking her door; ordered her to stop; refused, applied "mandibular angle pressure" to gain control and placed her in a restraint chair. Four supervisors signed off on the report (illegible and no dates) and no one asked about the deficiencies in the reports of all three officers about how and when they entered the cell, or any efforts at de-escalation other than telling her to stop. [BS000547-548]

- July 3, 2019 restrained a female inmate who had assaulted another inmate and was being placed in handcuffs by another officer. Five supervisors signed off on the report (illegible and no dates), and no one asked about the time this incident occurred, which is missing from the reports of both officers. Also, no supervisor asked why the first responding officer didn't request assistance before attempting to tackle the inmate. [BS000550-551]

- August 5, 2019 while escorting an inmate back to his cell, inmate turned on Morgan and Morgan thought he was going to punch him, so Morgan delivered one closed-fist strike to the inmate's face. Four supervisors signed off on the report (illegible and no dates) and didn't inquire why Morgan didn't request backup before engaging the inmate, nor did they ask why the inmate was out of his cell after being confined to his cell earlier in the night because the inmate was threatening officers. No one asks if there was a disciplinary report written. [BS000552-553]

- August 28, 2019 was conducting a shakedown, found contraband, informed the inmate they would receive disciplinary "tickets'; ordered disruptive inmate to return to his cell; conducted a takedown; used a closed fist to strike inmate's shoulder; then called for assistance. Two supervisors signed off on the report (illegible and no dates) and didn't ask why inmates were at or near their cells while their cells were being searched (contrary to accepted correctional practice which requires inmates to be secured elsewhere), why Morgan didn't have assistance, and why Morgan waited until after the use of force to request back-up. [BS000556-557]

- September 9, 2019 intervened with two inmates who were fighting; one ceased to fight but the other did not; Morgan did a takedown; delivered two closed-fist strikes to inmate's right side. Inmate was <u>transported to the hospital</u> "due to his injuries". Four supervisors signed off on the report (illegible and no dates). [emphasis added] No one asked why Morgan didn't wait for back-up before approaching the inmates, or if there were alternatives (e.g., pepper spray), or how the inmate was injured (i.e., whether from the altercation with the other inmate or from Morgan's punches) that required a hospital transport. [BS000560-561]

- October 28, 2019 was awakening an inmate [who was in a suicide smock] to attend court; inmate said ". . .he was not able to stand up that he hurt too bad. . . "; gave inmate another order; took inmate by arm; did a takedown; inmate continued to resist; delivered one closed-fist strike to the inmate's left side area. Four supervisors signed off on the report (illegible and no dates). No one asks why the inmate was claiming to be in pain, what other issues were associated with an inmate in a suicide smock (e. g. see discussion in this report regarding inmates with mental

illness), de-escalation efforts, or the option of just leaving the inmate in place and requesting medical to come to the unit. [BS000564-565]

- November 6, 2019 arrived at cell in which inmate was "actively choking" another inmate; called for back-up; entered cell; delivered one closed-fist strike to the inmate's left side; delivered two more strikes to the left side; assistance arrived. Four supervisors signed off on the report (illegible and no dates). No one asked why Morgan didn't wait for back-up or if alternatives existed such as pepper spray. No one asks why these inmates were fighting (perhaps misclassified or inappropriately housed?) [BS000567-568]

- November 20, 2019 he tried to get inmate out of "chair" (presuming that is the restraint chair). Inmate failed to follow directions to remain with his hands on the wall, lunged at Morgan, who did a takedown. When inmate continued to resist, Morgan delivered one closed-fist strike to inmate's upper body and "inadvertently" hit inmate in "facial region"; inmate placed back in chair. Four supervisors signed off on the report (illegible and no dates). No one asks why and how long the inmate was in the restraint chair, or whether there was a plan among the three responding officers to safely remove the inmate from the restraint chair; no pertinent information was provided in the reports. [BS000570-571]

- November 22, 2019 inmate was kicking the door (see also above incident); placed in restraint chair; entered cell; inmate became aggressive; Morgan says he didn't use force; two different officers delivered closed strikes. Four supervisors signed off on the report (illegible and no dates). There were four officers involved. No supervisor asked why there was no plan to extract the inmate from the cell. Is there not a policy on cell extraction in the Butler County Sheriff's Office jail? [BS00574-575]

- November 25, 2019 was handling inmates who were getting new housing assignment when one became argumentative; inmate lunged at Morgan twice; second time Morgan performed a takedown; then one closed-fist strike "inadvertently" striking the inmate's face. Four officers were present, and all four officers struck the inmate, for a total of 10 strikes (their count). Four supervisors signed off on the report (illegible and no dates). No one asks why there were no

better tactics, and whether this was possible use of excessive force. [BS000577-578]

As with Thurkill, this is a stunning and disturbing pattern of uses of force. A use of force per month for Morgan, including several implausible "inadvertent" closed-fist strikes to the head or face. Most incidents could have been avoided, or at least mitigated by waiting for help. If there was any training provided to Morgan about managing inmates, it was certainly not evidenced by his behavior; and as with Thurkill, none of his supervisors or jail leadership seemed to know about his pattern of uses of force, or even care.

## IX.  Employee Training and Training Records of Thurkill and Morgan

Butler County Sheriff's Office policies and procedures governing training are inadequate. Butler County Sheriff's Office policy 2.09 Training and Proficiency Testing [BS003072] governs training, assigning responsibilities to a Training Coordinator with a host of responsibilities and reporting obligations, none of whose outcomes and products were provided by the County (e. g. annual training analysis, annual training plan, implementing and managing the training plan, etc. [BS3073]. The classes developed by the Training Coordinator are approved by the Sheriff [BS003074]). Per this policy, employee proficiency is measured only in the areas of firearms, chemical weapons, batons, specialty weapons, emergency vehicles, breathalyzer, radar, and legal updates [BS003075]. While instructors are required to be able to develop lesson plans and training performance objectives, no lesson plans are required by this policy [BS003077]. The policy does not establish how proficiency testing will be accomplished for the mandated areas (see above) or for any other Butler County Sheriff's policies and procedures or jail policies (post orders).

As an example, Thurkill's training file include as one page "In-Service Training", 9/5/2007, Housing Unit Post Order, Use of Force" but includes no reference so what was included in that training. [BS000900]. Thurkill's possible documentation of new officer training in 2007 includes a checklist of tasks, with no information on what was included in those tasks; nor is use of force included in these pages of documentation [BS00902-00919]. There are "sign-offs" provided documenting "Has read all directives for the month listed below" with no directives listed. [Examples BS000949, BS000963, BS001008. BS001009]]. One "quiz" is provided for Use of Force for a training in 2009, which again has no lesson

plan, and is so basic that any citizen could probably pass it. [BS000985]. In essence, these are exceptionally poor training records maintained, with no evidence of what was included in the training, and in most instances, no demonstration of any knowledge gained.

There were no policies or procedures provided by the County that implement and oversee the initial officer training program (FTO – Field Training Officer] or for the "FTO Training Package Supervisors" [BS000800-000877]. While such programs are critical to a jail's operation, there is no policy guidance in Butler County for these programs; therefore the programs are of no or questionable value. Just having forms to check boxes without providing the underlying required skills, knowledge, and abilities is wholly insufficient, along with the other policy safeguards.[64]

Of note, Butler County Sheriff's Office policy number 5.01 Response to Resistance and Deadly force requires *annual* training for response to resistance and use of deadly force for all sworn personnel. [emphasis added]. [BS005249] This mandate is not included as part of the annual training requirements of policy 2.09 Training and Proficiency Testing, noted above. This seems to be a significant and glaring omission and offers troubling insight into the overall priorities and focus of agency leadership.

The County provided, presumably as evidence or documentation of corrections officer training, items that do not include any training lesson plans that describe what topics or tactics were covered in the training, and whether any participant demonstrated competence following the training. This information was grossly inadequate and fails to demonstrate that any of the involved employees received relevant or credible training.

Throughout the documents provided by the County there is reference to DMS or Power DMS, or reports are referenced as being generated by Power DMS. There are references to requirements that staff must perform what appear to be training-related activities on Power DMS [for example BS002466]. In Thurkill's Answers to Plaintiff's First Set of Interrogatories, for example on page 4, "The Butler County Sheriff's Office conducts annual, continuing education for corrections officers and utilizes trainings by PowerDMS." Also, Morgan's Answers to Plaintiff's First Set of Interrogatories, page 4 repeat that exact

---

[64] McCampbell, Susan W., and Michael S. McCampbell, Strategies to Implement and To Improve Training Officer (CTO) Programs, Center for Innovative Public Policies, Inc., January 2020 http://www.cipp.org/uploads/3/7/5/7/37578255/cippjanuary2020jtp.pdf

same language. Even in the collective bargaining agreement, language is included on page 75 that "Employees shall complete four (4) additional assignment using Power DMS or some similar program" [BS003375]

Nowhere in any materials or documents provided by the County is there any policy, procedure, or directive that describes or explains the uses or purposes of PowerDMS. An Internet search reveals that PowerDMS is proprietary software, which is sold for, among other things, a document management system.

Looking through the references in documents provided by the County, I can infer that there may be training materials and other information relevant to this matter which have not been produced or disclosed. At the very least, the County should explain how it uses PowerDMS and provide governing policies, procedures, or even contracts with the company. Without such information, I am unable to comment on the County's use of this software and so do not attempt to do so in this report.

The training information provided by the County was:

- A State of Ohio lesson plan for "Subject Control <u>Instructor</u>", but no lesson plans were provided regarding how this training was given to Butler County jail officers, the qualifications of the individuals who conducted this training, how they were trained, who participated, the participants' demonstration of competence, or any remedial training. [BS001966-002321]

- A participant manual for the National Institute of Corrections, Interpersonal Communications in the Correctional Setting, March 2004. The County did not provide the qualifications of the individuals who conducted this training, who participated, the participants' demonstration of competence, or any remedial training. [BS002322-002422]

- Unidentified documents appearing to be titled "FTO Training – General Knowledge Master Course," which does not identify what this is, if it is part of training, or any of the issues noted above (e. g. who was trained, etc.) [BS002423 – 002433]

- Unidentified documents appearing to be titled "Emergency Restraint Chair Master Course" - with no other information [BS002466-002487], duplicated at [BS002682-002700], and again duplicated at [002816-002842]

- Power Point Presentation (not a lesson plan) Ohio Attorney General, Peace Officer Training Commission, Corrections Basic Training, Unit 4: Human Relations, Topic 1: Interpersonal Communication in a Correctional Setting (effective date: 2015/01/01) [BS002466-002559], duplicated at [BS002701-002772], duplicated at [BS002664-00BS002935]

- Unidentified documents appearing to be titled "IPC Skills Master Course" with no context [BS002560-002564], duplicated at [BS002773-002777], and again duplicated at [002936-002940]

- Unidentified documents appears to be titled "Use of Force and Civil Liability Section 001", with no context. [BS002565-002568], duplicated at [002778-002781], and again duplicated at [002941-002983]

- Unidentified materials titled United States Supreme Court Graham v. Connor (1989) with no context. [BS002598-002611]

- Unidentified materials titled 503 US. 1 Hudson v. McMillian (No. 90-5631) with no context [BS002612-002632]

- Unidentified materials titled United States Supreme Court Tennessee v. Garner, (1985), No. 83-1035 with no context. [BS002633-002658]

- Unidentified materials titled 475 U.S. 312, Whitley v. Albers (No. 84-1077) with no context. [BS002659-002680]

It is axiomatic in corrections and jail operations that *if it isn't written down, it didn't happen*. Even though the County may have believed that it was training its employees, there no documentation that it did. There were insufficient policies to guide lesson plans. There are no lesson plans. There are no records of what was taught in the various segments noted in employees' records. There is, essentially, nothing.

## X.    Findings

### A.  Butler County Jail's Policies and Procedures

Specifically in regard to the Butler County Jail's policies and procedures governing the critical policies and procedures of relevance to Mr. Benty's complaint, I find these are wholly deficient in providing specific direction to employees, providing for supervisory oversight, and establishing leadership accountability at the Sheriff's Office or in County government.  The leadership seems to be unconcerned, naïve, or inexperienced in their jail leadership skills, knowledge or abilities. All this evidences a general and deliberate indifference to the operations of the Butler County Jail and the welfare of inmates. Inevitably, the result is harm to Mr. Benty and others.

### B.   Practices, Investigations and Oversight

As the result of deficient policies and procedures, I find no consistent operational practices aligned with accepted jail/correctional practices (and Ohio Minimum Standards for Jails), thus allowing employees to exercise far too much discretion in managing the jail's inmate population, most critically in the matter of use of force/excessive use of force.   The result documented in this report is the harm to Mr. Benty caused by two jail employees. The analysis in this report demonstrates the Butler County jail's failure to operationalize the State's Minimum Jail Standards in inmate discipline and other areas, which had the outcome of harm/injury to Mr. Benty.   The absence of any, <u>any </u>leadership oversight of the use of force is egregious and a dereliction of duty for the County.   The County is aware, or should be aware,  that 63% of inmates in their jail have mental illness, yet operational practices seem to disregard this fact.  The County failed to provide adequate care to these inmates.   Mr. Benty suffered as a result of this deliberate indifference.

Most importantly, the County and the Butler County jail are not following what few policies are in place in terms of investigations and oversight.  Internal policies require reviews (for example 5.01 and SGT-15) but no documentation was provided that these internal policies are followed in practice, a situation that resulted in harm to Mr. Benty by failing to prevent excessive force.

The County's and the Butler County Sheriffs Office's leadership's lack of oversight of the jail's operations is also not lost on employees or on inmates.  These de facto informal

operational practices allow an internal culture to flourish that endorses violence and makes harm to Mr. Benty and others the predictable and almost inevitable result.

C.  Training

There is no relevant documentation provided by the County of training provided to employees regarding critical areas such as use of force, or anything else of relevance to jail operations. There are voluminous pages of materials provided by the County that purport to reflect employee training, but which in fact amount to nothing. Without lesson plans and evidence of knowledge gained, there is no evidence. Without policies that provide specific operational direction to employees working in the Butler County jail, there cannot be any credible training.

## XI.  Conclusions

Returning to the Mr. Benty's complaint, here is what the evidence, documentation, and application of my correctional knowledge demonstrates to a reasonable degree of professional certainty:

A.  Mr. Benty was the victim of excessive force at the hands of two correctional officers working in the Butler County, Ohio jail. These officers have proven themselves to be violent, culpable violators of accepted correctional practice and jail policy. They are also products of a jail environment that condones excessive force by failing to provide sufficient direction to employees, and just as importantly, by failing and neglecting to provide any oversight at all regarding uses of force. The two officers involved in Mr. Benty's assault have a shocking record of excessive force, just in the 24 month period in 2018-2019.

B.  The force used to injure Mr. Benty was objectively *unreasonable*, as Mr. Benty had done nothing to warrant the use of any force.

C.  The injuries Mr. Benty suffered because of the use of excessive force caused serious and permanent bodily injury.

D.  Because neither officer involved in this assault has much credibility, as evidenced by their conflicting testimony, depositions, and reports, it appears to me likely Mr. Benty was subjected to racially motivated threats such as "I'll knock your gold teeth out you fucking nigger!" and "I will knock your gold teeth out." The changing stories of the officers, the absence of any narrative about what happened in their report,

and Mr. Benty's consistent and plausible statements, make Mr. Benty's claims credible.

E. The officers acted willfully, cruelly, maliciously, and sadistically, with no legitimate penological purpose; and their actions resulted in intentional infliction of pain and emotional distress. This is without question. Reviewing the record of the uses of force for Thurkill and Morgan can result in no conclusion other than that their actions were outside of policy and accepted practice and furthered nothing more than the officers' need to exercise "power" over inmates, even inmates with documented mental illness. This internal culture and permissive environment resulted in predictable harm to Mr. Benty.

F. The officers failed to follow written policies and procedures in their application of excessive force, those of the State of Ohio, and the policies of the Butler County Sheriff's Office. That these officers operated outside policies and procedures is without a doubt; but so did their superior officers in abrogating their responsibilities to be accountable for what was happening in their jail, thus causing predictable harm to Mr. Benty.

G. That Butler County adopted, enforced, and acquiesced in policies, customs and jail practices, and inadequate supervision and training for jail staff, resulting in harm to Mr. Benty. Having failed to develop and implement policies within the mandates of the State's Minimum Standards, failed to provide any credible training, combined with the absence of credible investigations, and with absentee leadership – the Butler County Jail was, and probably remains, a dangerous jail for people like Mr. Benty.


Submitted by:

Susan W. McCampbell
July 11, 2022

<u>Attachment 1 - Benty vs. County of Butler, Ohio, et al.; materials reviewed or relied upon</u>

1. Mauricio Benty, Videoconference Deposition, 4/22/2022
   - Exhibit A      Disciplinary Notice 5/30/2019
   - Exhibit B      Jail Incident Report 5/29/2019
   - Exhibit C      Floorplan?
   - Exhibit D      Letter to Warden 7/1/2019
   - Exhibit E      Medical Encounter 5/11/2019
2. Benty request for public records June 20, 2019; plus email
3. Mauricio Benty's Responses to Defendant's First Set of Interrogatories, Requests for Production of Documents and Requests for Admissions, December 20, 2021
4. Benty Property Record
5. Call Detail 4/26/2019 – 7/14/2019
   - Calls (89) Records
6. Employee Related
   a) Thurkill, Joel, Electronic Receipt of Policies and Procedures Manual Revision 6/1/2009 signed 8/20 2015
      a. Thurkill Training Log 2015-2020
      b. Thurkill training file
      c. Personnel File
      d. Notice of Complaint Use of Force 3/27/2018 Brent McQueen
      e. Letter of response to request for records 7/11/2019
      f. Use of Force 3/8/2018
   b) J. Morgan, FTO Training Packet, March 2019
   c) Morgan, Personnel File 3/11/2019 – 3/26/2021
   d) Morgan, Notice of Complaint on Staff Member – use of force Benty
   e) Benty Request Thurkill File 2019
      a. Training related, use of force
      b. Incident involving Benty
7. Inmate Roster H2Block 5/30/2019
8. Inmate Roster H2Block 5/31/2019
9. 2nd Shift Assignment Sheet, 5/30-31/2019
10. 1St Shift Assignment 7A – 7P 5/30/2019
11. Daily Activity Log Checklist 5/29 - 30/2019 arrival of Benty
12. Crowthers, Josh, Notice of Complaint 10/9/2019, Allegations of Sleeping on Duty and Excessive/Unreasonable Use of Force, Investigation
      a. Use of Force 6/24/2018 use of force
13. Request for Incident Reports Re: Benty 7/2/2019 from Lt. Carrie L. Schultheiss; Request for use of force dated 5/31/2019 and discipline record of Sgt. Thurkill; 11/16/2020 Benty re: incident report and disciplinary hearing
14. Policies/Post Orders
      a. Table of Contents (Alphabetical) Butler County Sheriff's Office Policies and Procedures with Associated Forms
         i. Policies
      b. ICE-14 Post Order Use of Force

c. SMO-01 Use of Force 2016, 2021 in training materials Subject Control Instructor
d. SMO-02 Emergency Restraint Chair 2021 in training materials Subject Control Instructor
e. SMO-03 X-26/X-26P Advanced Taser Rev 2017, 2021. in training materials Subject Control Instructor
f. SMO-04 Restraints Rev 2013, 2021 in training materials Subject Control Instructor
g. SMO-05 Direction Sheet Subject Management Orders 2013, 2021 in training materials Subject Control Instructor
h. SMO-06 Custom carbine Sx Pepper Gun 2013, 2021 in training materials Subject Control Instructor
i. SMO-07 – Nova Stun Shield 2018, 2021 in training materials Subject Control Instructor
j. SMO-08 Chemical Weapon (Pepper Gel) in training materials Subject Control Instructor 2021
k. SGT-01 Posting Shift Assignment 2013
l. SGT-15 Critical Incidents 2013
m. SGT-19 Contract Agency Notification 2016
n. SGT-27 Staff Training
o. SGT-28 – Staffing
p. SGT-19 Security 2016
q. HOU-04 Incident Reports 2013
r. HOU-07 Inmate Segregation
s. HOU-10 Inmate Discipline 2016
t. HOU-33 Inmate Grievance Procedures 2014
u. PREA 2018
v. Clas-01 Classifying Incoming Inmates 2018
w. Class-03 Colored Armbands Procedure/Inmate uniforms
x. Clas-04 General Housing Assignments 2018
y. CO Position Description 2006

15. Inmate Handbook 4/2019
16. Corrections Use of Force
    a. Year 2018/Reported Date, Employee Last Name
    b. Year 2019/Reported Date, Employee Last Name
    c. Year 2020/Reported Date, Employee Last Name (includes type of force, weapon, subject name)
    d. Year 2021/Reported Date, Employee Last Name (includes type of force, weapon, subject name)
17. Inmate Felix, Bruce Lee
    a. Incident Report 5/29/2019
18. Inmate Robinson, Cameron
19. Inmate Fugate, Stephen Mark
20. Inmate Pack, Orlando Joshua
21. Inmate Fugate, Robert Charles
22. Inmate Fugate, William Samuel Richard

23. Inmate Sean Andrew
24. Staff/Sergeant Assignments
25. McQueen Audio 4/3/2018 re: Thurkill Interview in patrol car
26. Morgan, Jeremiah – training record 2019 – 2021
27. Training Materials
    a. Subject Control Instructor 2 week (Principles of subject control) 2016 (Cooper Institute)
28. CBO April 27, 2018 – April 29, 2022.
    a. County Risk Sharing Authority (CORSA) unmanned aircraft
    b. CORSA Coverage Change
    c. Corrections Supervisors April 27, 2018 – April 29, 2022.
    d. Coverage Agreement 2019
    e. Change in Coverage
    f. 1029-2020 Memorandum of Coverage
29. Organizational Chart June 2020, Feb 2019
30. Benty, Mauricio 11/16/2017, 5/25/2019, 5/21/2019 (x2), 5/29/2019, 6/6/2019
31. ICE Detention Standards Review Worksheet
32. ODRC Annual Inspection 2017, 2018, 2019, 2020
    a. 2019 out of compliance with 5120:
    b. 1-8-03 (B) (9) Essential - (B) Each full service jail shall have written policies and procedures, and practices which evidence, that the following minimum standards are maintained. (9) (Essential) Inmates in physical restraints shall be personally checked by staff every ten minutes. The report of the use of physical restraints shall be reviewed and signed off by a non involved supervisor or higher ranking personnel. The use of physical restraints shall be reviewed for policy compliance by the jail administrator or designee.
    c. 05 (E) Essential (E) (Essential) The jail shall be inspected annually by local or state health authorities and a written report shall be provided. There shall be a written plan to correct jail-related deficiencies.
    d. 07 (E) Important (E) (Important) The jail shall provide general visitation hours that provide inmates the opportunity for thirty minutes of visitation per week. If the jail utilizes video visitation, it will provide weekly general visitation hours that are supported by the video visitation system utilized, no less than twenty minutes per visit. A schedule of visiting hours shall be posted in inmate and visitor areas.
    e. 1-8-09 (D) (Essential) Health appraisal. Within fourteen days, a licensed nurse, physician, physicians assistant, or paramedic shall complete a health appraisal to determine the medical and mental health condition for each inmate in custody. Such appraisal shall at least include the following:
    (1) Review of receiving screen.
    (2) Collection of additional data to complete the medical, dental and mental health history.
    (3) Laboratory, and/or diagnostic tests to detect tuberculosis and other suspected communicable diseases as designated by the health authority.
    (4) Recording the height, weight, pulse, blood pressure and temperature.
    (5) Medical examination as determined by the examiner.

(6) Mental health assessment.
(7) Initiation of therapy when determined necessary by the examiner.
(8) Development and implementation of a treatment plan.

If performed by an licensed practical nurse or paramedic, the assessment should be reviewed and approved by a registered nurse or more highly qualified health care professional.

(9) Other test and examination as determined by the examiner or health authority.

f.   09 (N) Essential  Suicide prevention program. The health authority shall have a plan for identifying and responding to suicidal and potentially suicidal inmates. The plan components shall include:

(1) Identification The receiving screening form contains observation and interview items related to the inmates potential suicide risk. Circumstances include but are not limited to: profound incidents/issues, court dates, loss of significant others either by accident, natural causes or by suicide, sentencing, divorce, rejection, bad news, after a humiliating issue, etc. may be high risk periods for inmates.

(2) Training Staff members who work with inmates are trained to recognize verbal and behavioral cues that indicate potential suicide and how to respond appropriately. The plan includes initial and annual training.

(3) Assessment The plan specifies a suicide risk assessment and level system. The assessment needs to be completed every time an inmate is identified as being or potentially being suicidal, or if circumstances change. Only a qualified mental health professional may remove inmates from suicide risk status.

(4) Housing The plan must designate the housing beds/units for the suicidal or potentially suicidal inmates.

(5) Monitoring The plan specifies the procedures for monitoring an inmate who has been identified as potentially suicidal. A suicidal inmate is checked at varied intervals not to exceed ten minutes. Regular documented supervision is maintained. Inmates are placed in a designated cell, all belongings removed and other prevention precautions initiated, as appropriate.

(6) Referral The plan specifies the procedures for referring a potentially suicidal inmate and attempted suicides to a mental health care provider or facility, and includes time frames.

(7) Communication The plan specifies for ongoing communications (oral and written), notifications between health care and correctional personnel regarding the status of suicidal inmates.

(8) Intervention The plan addresses how to handle a suicide in progress, including first-aid measures.

(9) Notification The plan includes procedures of notifying the jail administrator, outside authorities and family members of completed suicides. The plan shall consider safety and security issues when it comes to notification.

(10) Reporting The plan includes procedures for documenting, monitoring and reporting attempted or completed suicides. Completed suicides are immediately reported to the coroner/medical examiner and the division of parole and community services within thirty days of the incident.

(11) Review The plan specifies procedures for medical and administrative review if a suicide or a serious suicide attempt occurs.

(12) Critical incident debriefing The plan specifies the procedures for offering critical incident debriefing to affected staff and inmates.

g. 17 (F) Important (F) (Important) There shall be a written policy and procedure governing the screening, training and use of volunteers in the jail.

h. 18 (A) Important   Jail support staff with routine contact shall receive training in pertinent agency policies and procedures prior to or in conjunction with assignment to jail duties

(1) During the first year of assignment receive twenty-four hours of training including legal aspects of corrections, basic security concepts, emergency preparedness, interpersonal communications, first aid/CPR, unarmed self-defense, and "Standards for Jails in Ohio."

(2) Two hours of in-service training each subsequent year of employment addressing specific job assignments and/or jail related issues.

i. <u>Out of compliance</u>:

    i. 04 (A)(4) Important (4) Dayspace:

    (Important) Thirty five square feet per number of occupants occupying the dayspace at one time. Minimum size of one hundred five square feet. The inmates will be granted regular, daily access to the dayspace area, subject to limitations necessary to maintain safety, security, and order. Jail administrators should approve any denial of dayspace in writing.

    ii. 1-9-9 (D)(3) Essential   Laboratory, and/or diagnostic tests to detect tuberculosis and other suspected communicable diseases as designated by the health authority.

j. 2021 Remains out of compliance with 5120: 1-8-09(D) See above.

33. Incident Report – Fight between Felix and Benty 5/29 2019
34. Records Retention Schedule
35. Email lawsuit re: Benty 7/1/2021
36. Complaint
37. Defendant Butler County's Request to Plaintiff's First Set of Requests for Production 2/22/2022
38. Defendant Butler County's Answers to Plaintiff's First Set of Interrogatories 2/21/2022
39. Defendant Joel Thurkill's Response to Plaintiff's First Set of Requests for Admission 2/18/2022
40. Defendant Joel Thurkill's Answers to Plaintiff's First Set of Interrogatories 2/18/2022
41. Defendant Jeremiah Morgan's Answers to Plaintiff's First Set of Interrogatories 2/18/2022
42. Defendant Jeremiah Morgan's Response to Plaintiff's First Set of Requests for Admission 2/18/2022
43. Thurkill Deposition and Exhibits 4/26/2022
44. Fischer Deposition 4/29/2022

45. Morgan Deposition 4/28/2022
46. Ohio Minimum Standards for Jails
    https://drc.ohio.gov/Portals/0/BAD/Minimum%20Standards%20for%20Jails.pdf?ver=2016-09-22-135837-547
47. Benty Jail File (redacted) (BS 1 – 26)
48. Benty Internal movement logs (BS 27 – 29)
49. Benty Medical File (BS 00030 – 00298)
50. Benty "kites" (BS 000299- 000370)
51. Benty incident reports (BS 000371 – 000377)
52. Use of Force Report 5/30/2019 (BS 000378 – 000387)
53. Incident Report – Morgan (BS 000388)
54. Incident Report – Thurkill (BS 00389)
55. Investigation – Morgan (BS 000390 – 000425)
56. Investigation – Thurkill (BS 000426-000430)
57. Defendants' Fed. R. Civ. P. 26 (a) (1) Initial Disclosures
58. U. S. Department of Justice, Bureau of Prisons, National Institute of Corrections, Developing and Revising Detention Facility Policies and Procedures, page 1, https://s3.amazonaws.com/static.nicic.gov/Library/018679.pdf accessed on July 26, 2022.
59. U. S. Department of Justice, Bureau of Prisons, National Institute of Corrections, https://nicic.gov/projects/correctional-policy-and-procedure accessed June 26, 2022
60. Standards for Jails in Ohio, Jail Administrator Resource Guide for Jail Inspections, https://drc.ohio.gov/Portals/0/BAD/JailAdministratorsResourceGuide.pdf?ver=2016-09-22-135837-063
61. Bronson, Jennifer Ph.D., and Marcus Berzofsky, Dr. P.H., Indicators of Mental Health Problems Reported by Prisoners and Jail Inmates 2011-12, U. S. Department of Justice, Bureau of Justice Statistics, June 2017 https://www.bjs.gov/content/pub/pdf/imhprpji1112.pdf
62. Samuel Walker, Geoffrey P. Alpert and Dennis J. Kenney, Early Warning Systems: Responding to the Problem Police Officer, U. S. Dept. of Justice, Office of Justice Programs, National Institute of Justice, July 2001 [emphasis added] https://www.ojp.gov/pdffiles1/nij/188565.pdf
63. Law Enforcement Leader's Guide on Combat Veterans:  A Transition Guide for Veterans Beginning or Continuing Careers in Law Enforcement https://www.theiacp.org/sites/default/files/2018-08/LeadersGuide_300dpi.pdf
64. McCampbell, Susan W., and Michael S. McCampbell, Strategies to Implement and To Improve Training Officer (CTO) Programs, Center for Innovative Public Policies, Inc., January 2020 http://www.cipp.org/uploads/3/7/5/7/37578255/cippjanuary2020jtp.pdf
65. U. S. Department of Homeland Security, Immigration and Customs Enforcement, Office of Professional Responsibility Inspections and Oversight Division, Office of Detention Oversight Compliance Inspection, Enforcement and Removal Operations ERO Detroit Field Office Butler County Jail, Hamilton, Ohio, April 28 – 30, 2015 https://www.ice.gov/doclib/foia/odo-compliance-inspections/butlerCountyJailHamiltonOhApr28-30-2015.pdf

66. U. S. Department of Homeland Security, Immigration and Customs Enforcement, Office of Professional Responsibility Inspections and Oversight Division, Office of Detention Oversight Compliance Inspection, Enforcement and Removal Operations ERO Detroit Field Office Butler County Jail, Hamilton, Ohio, July 16-18, 2019 https://www.ice.gov/doclib/foia/odo-compliance-inspections/butlerCountyJailHamiltonOhApr28-30-2015.pdf https://www.ice.gov/doclib/foia/odo-compliance-inspections/2019-ButlerCountyJail-HamiltonOH-0716-182019.pdf

67. County Elected Officials Guide to Criminal Justice System Decision Making, The Justice Management Institute, National Association of Counties, Pretrial Justice Institute, September 30, 2016, https://www.naco.org/sites/default/files/documents/County%20Elected%20Officials%20Guide%20to%20Criminal%20Justice%20Decision%20Making_FINAL.pdf

68. National Consensus Policy on Use of Force, January 2017, https://www.theiacp.org/sites/default/files/2018-08/National_Consensus_Policy_On_Use_Of_Force.pdf accessed July 7, 2022

69. International Association of Chiefs of Police, Employing Returning Combat Veterans as Law Enforcement Officers, September 2009, https://www.theiacp.org/projects/employing-returning-combat-veterans-as-law-enforcement-officers accessed July 7, 2022

# Attachment 2 - Susan W. McCampbell

**Criminal justice practitioner, policymaker, and researcher, with extensive experience in corrections and criminal justice system leadership. Local government experience includes: four years of managing one of the nation's largest local jail systems and managing a full service urban sheriff's office. Experience as a Federal Court Special Master, Court Monitor, and expert witness in correctional practices. Significant experience in: conducting and managing criminal justice and corrections operations, and workforce and leadership development.**

## Education

Bachelor of Arts, Political Science, School of Government and Public Administration, The American University, Washington, D. C.

Master of City and Regional Planning, School of Engineering and Architecture, The Catholic University of America, Washington, D. C.

Certified Jail Manager (CJM), The Jail Manager Certification Commission, American Jail Association, May 1998 – October 2002, May 6, 2013 award CJM, Life.

MBTI® Qualified, May 2004.

## Awards

Francis R. "Dick" Ford Distinguished Service Award: For exceptional leadership, vision, and commitment to the professional advancement of local corrections and support of the American Jail Association, April 2018.

EPIC Award – Exceptional People Impacting the Community – The Mental Health Association of Broward County, 1998.

## Professional Memberships

American Jail Association, Life Member
Texas Jail Association, Life Member
American Probation and Parole Association, Board of Directors (2012- 2014)

## Professional Experience

**President Center for Innovative Public Policies, Inc. (CIPP) and McCampbell and Associates, Inc. 1999 – Present**

Founder and president of CIPP, a not-for-profit Florida corporation specializing in criminal justice, law enforcement, public education and public health related topics. Firm provides services private foundations and to state and local units of government. Ms. McCampbell is a faculty member of the National Jail Leadership Command Academy, Correctional Management Institute of Texas, Sam Houston State University.

McCampbell and Associates, Inc. provides expert litigative services for federal, state and local governments as well as the private bar. McCampbell and Associates has worked with the Department of Justice, Civil Rights Division, and the Department of Homeland Security, Office of Civil Rights and Liberties to conduct investigations, develop findings, and provide recommendations.

Initiatives of CIPP include:
- Project development and management for a large urban school district;

- Partnership with the National PREA Resource Center to provide training and technical assistance, as well as subject matter expertise;
- Curriculum development and training delivery to address staff sexual misconduct and responses to the Prison Rape Elimination Act for jails and law enforcement funded by both the U. S. Dept. of Justices Bureau of Justice Assistance and the National Institute of Corrections;
- Leadership development through production of books and articles, and provision of training, including lead faculty of the National Jail Leadership Command Academy.
- Development of core competencies and mentorship programs with BJA funding http://www.cipp.org/jail-mentoring-program.html and http://www.cipp.org/summary-of-core-competencies.html
- Development of tool kits to assist jail leaders, including:
  - Strategies to Implement and To Improve Jail Correctional Officer (CTO) Programs, http://www.cipp.org/uploads/3/7/5/7/37578255/cippjanuary2020jtp.pdf
  - Jump Start Your Jail's Leadership Development http://www.cipp.org/uploads/3/7/5/7/37578255/cipp_jump_start_leadership_development_3_28_19.pdf
  - Root Cause Analysis to Improve Jail Safety: Getting Past Blame http://www.cipp.org/uploads/3/7/5/7/37578255/rca_cipp_4_25_2019[5270]_1.pdf
  - The Jail Correctional Training Officer (CTO)/Field Training Officer (FTO) Program (under development) http://www.cipp.org/jail-corrections-trainingfield-training-programs.html
- Partner with the American Probation and Parole Association to develop and implement www.discovercorrections.com
- Improvement of public health through building bridges between law enforcement and public health entities funded by the Kaiser Family Foundation; and
- Workforce initiatives for criminal justice to include managing the multi-generational workforce, improving recruitment, retention, succession planning and leadership development in criminal justice agencies.

Go to www.cipp.org for description of these and other initiatives.

**Court Monitor – September 2018 – Present.** Serves as use of force monitor for U.S. v. County of Los Angeles and Los Angeles County Sheriff.

**Federal Court Monitor May 2013 – Present.** Serves as the lead Court Monitor to oversee the consent agreement and settlement agreement, the U. S. Dept. of Justice v. Miami-Dade County.

**Federal Court Monitor September 2013 – June 2019.** Served as a Federal Court Monitor to oversee the Consent Judgment between the LaShawn Jones et. al. vs. Marlin Gusman. http://www.nolajailmonitors.org/

**Court Monitor February 2012 – April 2018.** Served as the lead Court Monitor to oversee a private settlement agreement involving the county jail in Passaic County, New Jersey.

**Federal Court Monitor May 2010 – January 2017.** Served as a Court Monitor to oversee the settlement agreement between the U. S. and Cook County, Illinois and the Cook County Department of Corrections. Case dismissed by Federal Court pursuant to defendants achieving and maintaining substantial compliance with the provisions of the Agreed Order.

**Special Master March 2006 – February 2012.** Appointed by the Federal Court as Special Master in the matter of the United States of America v. Territory of the Virgin Islands addressing conditions of confinement in the Territory's prison and the jail on St. Croix.

**Broward County, Florida, Sheriff's Office**

**Chief Deputy/ Acting Sheriff Broward County Sheriff's Office, Fort Lauderdale, Florida September 1997 - January 1998** - Named Chief Deputy/Acting Sheriff upon the death of Sheriff Ron Cochran. Responsible for the day-to-day operations of the 3,400-member Sheriff's Office including corrections, law enforcement, communications, criminal investigation and all special operational activities associated with a major urban full service Sheriff's office.

**Director/Corrections January 1995 to September 1997, January 1998 - January 1999**. Daily responsibility for the management of a large local jail system, including 1,600 employees, three jail facilities, 4,300 inmates, and an annual operating budget of $110 million. Agency received initial accreditation from the Commission on Accreditation for Corrections in January 1996, and reaccreditation in 1999. Programs and services including booking, inmate classification, programs for incarcerated inmates, adult boot camp, inmate work programs, community work programs, pre-trial services, inmate medical and mental health services.

**Assistant Director/ Corrections August 1994 - January 1995** - Assistant Director/Community Corrections - supervised community corrections to include pre-trial services, work release, inmate community work programs, military-style offender boot camp and programs and services to county sentenced inmates. Responsible for the daily operation of a facility with an average daily population of 750.

**Commissioner Criminal Justice Standards and Training Commission, Florida Department of Law Enforcement, State of Florida October 1995 – January 1999** - Appointed by Governor Lawton Chiles to the 19-member Commission that oversees the training and licensing for more than 70,000 law enforcement, correctional probation and corrections officers.

**Assistant Sheriff Office of Sheriff, City of Alexandria, Virginia May 1983 - July 1994** - Directed inmate classification, mental health services, and alternatives to incarceration, work release, electronic monitoring, inmate programs, community volunteers, and the unit counselor program. Detention Center is a 343-bed direct supervision facility with an average daily population of 530.

May 1983 - January 1993 - Responsible for Administrative services Division, directed all administrative duties including personnel related activities (recruitment, testing, hiring, training, training officer program), budget and fiscal management, fleet management, public information, planning and research, inmate accounts and canteen, and policy and procedure development and implementation.

**Program Director Police Executive Research Forum, Washington, D. C. October 1981 - May 1983** – Program Director for PERF's participation in standards development and implementation for the national law enforcement accreditation project. Responsibilities included research to develop standards, drafting of policies and procedures relating to the accreditation process, liaison with staff and members of the Commission on Accreditation for Law Enforcement Agencies, Inc.

**Director/Public Safety Northern Virginia Planning District Commission, Annandale, Virginia August 1973 – October 1981**- Public Safety Division Director - responsible for conducting all tasks associated with the Commission's regional public safety program, including staffing the Northern Virginia Criminal Justice Advisory Council and its subcommittees, primary staff support to the Northern Virginia Chiefs of Police Commission, and the Northern Virginia Sheriffs' Association.

**Research Assistant Brookings Institution, Washington, and D. C. August 1971 - September 1972** – Research Assistant assigned to a project to develop evaluation criteria for projects funded by the Law Enforcement Assistance Administration, U. S. Department of Justice.

**Selected Publications**

Susan W. McCampbell, "Consequences of the Invisible Jail:  Embracing a Community-Connected Jail," American Jails, March/April 2022, page 21, http://www.cipp.org/uploads/3/7/5/7/37578255/consequences_of_the_invisible_jail_embracing_a_commun...[33192].pdf

Mary B. Earley and Susan W. McCampbell, "Contracting Heath Care:  Getting What you Pay For in a CQI Environment" in Public Health Behind Bars from Prisons to Communities, Second Edition, Robert B. Greifinger, Editor, Springer, 2021, page 105.

Susan W. McCampbell, "Root Cause Analysis to Improve Care: Getting Past Blame," in Public Health Behind Bars from Prisons to Communities, Second Edition, Robert B. Greifinger, Editor, Springer, 2021, page 209.

Susan W. McCampbell, How Transparent and Accountable is Your Jail?, American Jails, March/April 2021, page 21, http://www.cipp.org/uploads/3/7/5/7/37578255/2021_ma_mccampbell_how_transparent_and_accountable_is_your_jail[111 35].pdf

Susan W. McCampbell, The Next Jail Epidemic:  Staffing, American Jails, November/December 2020, page 53, http://www.nationaljailacademy.org/_documents/resources/recruitment-retention/the-next-jail-epidemic-staffing.pdf

Susan W. McCampbell, Listening to Your Employees:  Advice from Emerging Leaders, American Jails, July/August 2020, pg. 21, https://online.flipbuilder.com/wttx/nqxm/mobile/index.html

Susan W. McCampbell and Michael S. McCampbell, Strategies to Implement and To Improve Jail Correctional Officer (CTO) Programs, Center for Innovative Public Policies, Inc., January 2020, http://www.cipp.org/uploads/3/7/5/7/37578255/cippjanuary2020jtp.pdf

Susan W. McCampbell and Mary E. Earley, Root Cause Analysis to Improve Jail Safety:  Getting Past Blame, April 2019, Center for Innovative Public Policies, Inc. http://www.cipp.org/uploads/3/7/5/7/37578255/rca_cipp_4_25_2019[5270].pdf

Susan W. McCampbell, Jump Start Your Jail's Leadership Development, March 2019, Center for Innovative Public Policies, Inc., Naples, Florida, http://www.cipp.org/jump-start-leadership-development.html

Susan W. McCampbell, "Core Competencies and Jail Leadership: Reduce Jail-Related Liability Risks",  American Jails, January/February 2019, page 53, http://www.cipp.org/uploads/3/7/5/7/37578255/21_reduce_jail-rel...[3525].pdf

Susan W. McCampbell and Leon Valquier, "Core Competencies and Jail Leadership:  Establish Organizational Authority, Role, and Responsibilities", American Jails, November/December 2018, page 47, http://www.cipp.org/uploads/3/7/5/7/37578255/11_establish_authority.pdf

Susan W. McCampbell and Genie I. Elton, "Core Competencies and Jail Leadership:  Effective Communications," American Jails, September/October 2018, page 43, http://www.cipp.org/uploads/3/7/5/7/37578255/5_communicate_effectively.pdf

Susan W. McCampbell, "Core Competencies and Jail Leadership: Positive Organizational Culture", American Jails, July/August 2018, page 43,  http://www.cipp.org/uploads/3/7/5/7/37578255/7_positive_organizational_culture.pdf

Susan W. McCampbell and Anthony Yeber, "Core Competencies and Jail Leadership: Self-Awareness and Professional Commitment," American Jails, May/June 2018, page 35 http://www.cipp.org/uploads/3/7/5/7/37578255/10_self-awareness___professional_commitment.pdf

Jeanne B. Stinchcomb and Susan W. McCampbell, Resource Guide for Newly Appointed Warden, Second Edition, 2017, U. S. Department of Justice, National Institute of Corrections http://www.cipp.org/uploads/3/7/5/7/37578255/nicresourceguide2017.pdf

Susan W. McCampbell and Steve Timmons, "Core Competencies and Jail Leadership: Manage Power and Influence," American Jails, March/April 2018, page 27, http://www.cipp.org/uploads/3/7/5/7/37578255/16_manage_power_and_influence.pdf

Susan W. McCampbell and Penelope Sapp, "Core Competencies and Jail Leadership:  Inmate and Facility Management," American Jails, January/February 2018, page 33 http://www.cipp.org/uploads/3/7/5/7/37578255/19_inmate___facility_management.pdf

Susan W. McCampbell and Melissa McClellan., "Core Competencies and Jail Leadership: Manage Labor Relations," *American Jails,* November/December 2017, page 45, http://www.cipp.org/uploads/3/7/5/7/37578255/15_manage_labor_relations.pdf

Susan W. McCampbell and John W. Johnson, Sr., "Core Competencies and Jail Leadership: Jail's Role in the Criminal Justice System," *American Jails,* September/October 2017, page 35, http://www.cipp.org/uploads/3/7/5/7/37578255/12_jails_role_in_cj_system.pdf

Susan W. McCampbell and Jeffrey S. Warren, "Core Competencies and Jail Leadership: Strategic Planning," *American Jails*, July/August 2017, page 37, http://www.cipp.org/uploads/3/7/5/7/37578255/9_strategic_planning.pdf

Susan W. McCampbell and Malik Muhammad, "Core Competencies and Jail Leadership: Critical Thinking: Solving the Real Problem," *American Jails*, May/June 2017, page 45, http://www.cipp.org/uploads/3/7/5/7/37578255/1_critical_thinking.pdf

Susan W. McCampbell and Lynni O'Haver, "Core Competencies and Jail Leadership: Understanding, Assessing, and Managing Emerging Technology: The Jail Leader's Responsibility," *American Jail,* March/April 2017, page 31, http://www.cipp.org/uploads/3/7/5/7/37578255/22_managing_emerging_technology.pdf

Susan W. McCampbell, "Core Competencies and Jail Leadership: Mentoring and Coaching Others," *American Jails*, January/February 2017, page 47, http://www.cipp.org/uploads/3/7/5/7/37578255/4_mentoring_and_coaching_others.pdf

Susan W. McCampbell, "Core Competencies and Jail Leadership: Becoming a Full Partner with Human Resources," *American Jail, November/December 2016,* page 41, http://www.cipp.org/uploads/3/7/5/7/37578255/18_human_resources.pdf

Susan W. McCampbell, "Core Competencies and Jail Leadership: The Physical Plant and Infrastructure: the Jail Leader's Responsibilities," *American Jail,* September/October 2016, page 41, http://www.cipp.org/uploads/3/7/5/7/37578255/20_physical_plant_management.pdf

Susan W. McCampbell, "Core Competencies and Jail Leadership: Organizational Accountability: The Real Breakfast of Champions," *American Jails,* July/August 2016, page 35, http://www.cipp.org/uploads/3/7/5/7/37578255/2_organizational_accountability.pdf

Susan W. McCampbell, "Core Competencies and Jail Leadership: Time Management is Managing Yourself," *American Jails,* Volume XXIX Number 2, May/June 2016, page 35, http://www.cipp.org/uploads/3/7/5/7/37578255/17_time_management.pdf

Susan W. McCampbell, "Core Competencies and Jail Leadership: Vision and Mission: If You Don't' Know Where You are Going . . . You Are Already There," *American Jails,* Volume XXIX Number 1, March/April 2016, page 37, http://www.cipp.org/uploads/3/7/5/7/37578255/8_vision_organization_mission.pdf

Susan W. McCampbell, "Core Competencies and Jail Leadership: Fiscal Management," *American Jails,* Volume XXIX, Number 6, January/February 2016, page 51, http://www.cipp.org/uploads/3/7/5/7/37578255/6_fiscal_resourcesl.pdf

Susan W. McCampbell, "Core Competencies and Jail Leadership: The Jail and Your External Environment," *American Jails,* Volume XXIX, Number 5, November/December 2015, page 55, http://www.cipp.org/uploads/3/7/5/7/37578255/3_external_stakeholders.pdf

Susan W. McCampbell, "Core Competencies and Jail Leadership: Managing Change," *American Jails,* Volume XXIX, Number 4, September/October 2015, page 37, http://www.cipp.org/uploads/3/7/5/7/37578255/14_change_no_ads.pdf

Susan W. McCampbell, "Core Competencies and Jail Leadership: Decision-Making," *American Jails,* Volume XXIX, Number 3, July/August 2015, page 45, http://www.cipp.org/uploads/3/7/5/7/37578255/13_sound_decisions_no_ads.pdf

Susan W. McCampbell, "After the "Boomers," Who?" *American Jails,* Volume XXIX, Number 1, March/April 2015, page 25.

Susan W. McCampbell, "An Obligation to Grow Leaders: Guest Editorial" *American Jails*, Volume XXIX, Number 1, March/April 2015, page 5.

Susan W. McCampbell, "Priorities of the Day," *American Jails,* January/February 2013, page 15.

Susan W. McCampbell, "Discovering Corrections in a Sheriff's World", *Sheriff*, September/October 2012, page 54.

Susan W. McCampbell, "Discover Corrections: Extraordinary Choices, Extraordinary Rewards," *American Jails*, May/June 2012, Vol. XXVI, Number 2, page 8.

Susan W. McCampbell, "Discover Corrections", Texas Jail Association, *Key Issues*, Vol. XVI, No. 1, Spring 2012, page 25.

Jeanne B. Stinchcomb and Susan W. McCampbell, "Leading Jails into the Future Just Got Easier", *Sheriff,* November/December 2001, page 6.

Jeanne B. Stinchcomb, Cindy J. Smith, Susan W. McCampbell, Christina Mancini, National Jail Succession Planning and Leadership Development Project: Identifying Core Competencies and Required Knowledge, Skills, and Abilities (KSAs) for Jail Leaders: Methods and Outcomes, U.S. Dept. of Justice, Bureau of Justice Assistance (Cooperative Agreement No. 2009-D2-BX-K006), June 6, 2011 http://www.cipp.org/uploads/3/7/5/7/37578255/final_6.6.11bja-jails_mentoring-core_competencies.pdf

Jeanne B. Stinchcomb and Susan W. McCampbell, "Succession Planning: A Leader's Most Legacy", *American Jails*, May/June 2010, page 9.

Leslie Leip, Jeanne B. Stinchcomb and Susan W. McCampbell, Special Report: Selected Findings From the National Jail Workforce Survey – Employee Recruitment and Retention, September 2009, for the U. S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Assistance.

Susan W. McCampbell, Jeanne B. Stinchcomb and Leslie Leip, "The Sheriff's New Workforce Challenges: Retaining and Motivating Jail Employees", Sheriff, July/August 2009, page 58.
Jeanne B. Stinchcomb and Susan W. McCampbell, "The 21st Century Jail Workforce", *American Jails*, Vol. XXIII, No. 2, May/June 2009, pg. 15.

Susan W. McCampbell, "What the Prison Rape Elimination Act Means to Law Enforcement and CALEA*", CALEA Update*, Issue 100, June 2009, p. 7.

Jeanne B. Stinchcomb, Susan W. McCampbell, Leslie Leip (2009) The Future is Now: Recruiting, Retaining and Developing the 21st Century Jail Workforce, Center for Innovative Public Policies, Inc. for the U. S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Assistance.
http://www.cipp.org/uploads/3/7/5/7/37578255/developingthe21stcenturyjailworkforce05302011.pdf

Jeanne B. Stinchcomb and Susan W. McCampbell (2008), Jail Leaders Speak: Current and Future Challenges to Jail Operations and Administration: A Summary Report to the Bureau of Justice Assistance, Center for Innovative Public Policies, Inc., Naples, Florida.

Jeanne B. Stinchcomb and Susan W. McCampbell, "The State of Our Nation's Jails 25 Years Later" Identifying Current Jail Challenges," *American Jails*, Vol. XXI, No. 6, January/February 2008, pg. 15.

Jeanne B. Stinchcomb and Susan W. McCampbell, "Raising the Research Profile," *Corrections Today*, Vol. 70, No. 1, February 2008, pg. 72.

Barbara Owen, Susan W. McCampbell, James Wells, Staff Perspectives: Sexual Violence in Adult Prisons and Jails: Investigating Sexual Assaults in Correctional Facilities, U. S. Department of Justice, National Institute of Corrections, June 2007, Volume2. http://www.spr.org/pdf/Investigation_Sexual_Assaults_in_Correctional_Facilities.pdf

Susan W. McCampbell, "Recruiting and Retaining Jail Employees: Money Isn't the Long-Term Solution", *American Jails*, May/June 2006, page 9.

Susan W. McCampbell, "Gender-Responsive Strategies for Women Offenders: The Gender-Responsive Strategies Project: Jail Applications, Part III, *American Jails,* January/February 2006, page 14.

Susan W. McCampbell, "Gender-Responsive Strategies for Women Offenders: The Gender-Responsive Strategies Project: Jail Applications, Part II, *American Jails,* November/December 2005, page 15.

Susan W. McCampbell, "Gender-Responsive Strategies for Women Offenders:  The Gender-Responsive Strategies Project: Jail Applications, Part I, *American Jails,* September/October 2005, page 30.

Jeanne B. Stinchcomb, Susan W. McCampbell, Elizabeth P. Layman, Building the Workplace for the Future: 21st Century Challenges for Community Corrections, in Topics for Community Corrections, Annual Issue 2005, Developing Tomorrow's Leaders and Managers, U. S. Department of Justice, National Institute of Corrections, pg. 11.
http://www.nicic.org/library/period284

Jeanne B. Stinchcomb, Susan W. McCampbell, Elizabeth P. Layman, 2006, FutureForce: A Guide to Building the 21st Century Community Corrections Workplace, U. S. Department of Justice, National Institute of Corrections.
http://www.cipp.org/uploads/3/7/5/7/37578255/021799.pdf

Susan W. McCampbell, Gender-Responsive Strategies for Women Offenders: The Gender-Responsive Strategies Project: Jail Applications, U. S. Department of Justice, National Institute of Corrections, April 2005. http://www.nicic.org/Library/020417

Susan W. McCampbell and Allen L. Ault, "Lessons Learns, Miles to Go, Preventing Staff Sexual Misconduct with Offenders", American Jails, January/February 2005, Volume XVIII/Number 6, page 37.

Susan W. McCampbell and Joanne S. Valdes, "Curriculum: National Sheriffs' Institute", for the National Institute of Corrections, June 2005.

McCampbell, Susan W. and Paula N. Rubin, *Effectively Managing a Multi-Generational Workforce in Corrections:  A Training Curriculum*, National Institute of Corrections, March 2004.  https://nicic.gov/library/025268

Susan W. McCampbell and Jeanne B. Stinchcomb, "From Organizational Management to Inspirational Leadership: Changing Roles and Training Implications for Newly Elected Sheriffs," *Sheriff*, January – February 2004, 18.

Susan W. McCampbell and Elizabeth P. Layman, Preventing and Addressing Staff Sexual Misconduct in Community Corrections: A Training Program for Agency Administrators, National Institute of Corrections, March 2004. http://nicic.org/Library/020275

Susan W. McCampbell, Jeanne B. Stinchcomb and Elizabeth P. Layman, Needs Assessment of the National Sheriffs' Institute: A Report to the Jails Division of the National Institute of Corrections, Center for Innovative Public Policies, Inc. November 2003.

Susan W. McCampbell, Maureen Buell, Elizabeth Layman and Brenda V. Smith," Addressing Sexual Misconduct in Community Corrections," Perspectives: The Journal of the American Probation and Parole Association, Vol. 27, Number 2, Spring 2003, page 26.

Stinchcomb, Jeanne B., and Susan W. McCampbell, Final Report: National Institute of Corrections FY 2001 Cooperative Agreement # 01PGIR05 Assessment of NIC's Executive Leadership Training Program for Women, National Institute of Corrections, January 1, 2003 http://www.nicic.org/pubs/2003/018781.pdf

Susan W. McCampbell, Elizabeth P. Layman, and Paula N. Rubin, Investigating Allegations of Staff Sexual Misconduct with Inmates in a Jail Setting A Training Program for Administrators and Investigators, National Institute of Corrections, March 2003.

Susan W. McCampbell, Elizabeth P. Layman, and Paula N. Rubin, Staff Sexual Misconduct with Inmates: Implications for Jail Administrators: A Training and Technical Assistance Handbook, National Institute of Corrections, March 2003.

Susan W. McCampbell, "Making Successful New Wardens," Corrections Today, October 2002, page 130. Susan W. McCampbell, "So You Want to Be the Boss: Tips for Becoming a Jail Administrator," *American Jails*, September/October 2002, pg. 17

Susan W. McCampbell and Larry S. Fischer, Staff Sexual Misconduct with Inmates: Policy Development Guide for Sheriffs and Jail Administrators, National Institute of Corrections, August 2002.

Susan W. McCampbell, "Investigating Allegations of Staff Sexual Misconduct with Inmates", *Sheriff,* November – December 2001, page 20.

Susan W. McCampbell, "Mental Health Courts: What Sheriffs Need to Know", *Sheriff*, March – April 2001, page 40.

Susan W. McCampbell, Elizabeth Layman, and Andie Moss "Sexual Misconduct in Corrections", by, *American Jails*, Vol. XIV/Number 5, November/December 2000.

Susan W. McCampbell and Elizabeth P. Layman "Training Curriculum for Investigating Allegations of Staff Sexual Misconduct with Inmates", Center for Innovative Public Policies, Inc., October 2000. http://www.nicic.org/Library/016804

Paula N. Rubin and Susan W. McCampbell, "Needle Exchange Programs: The Bottom Line for Jails," *American Jails*, Vol. XIV, Number 2, May/June 2000.

Susan W. McCampbell, "Finding Friends in the Right Places: Coalitions to Address the Mentally Ill in Jails", *American Jails*, Vol. XIII, Number 3, July/August 1999, p. 52.

Susan W. McCampbell and Jeanne B. Stinchcomb, "Transitioning Staff Training to the 21st Century – Moving from Inmate Instructors and Court Orders to the Interactive Internet and Cyberspace", *American Jails*, Vol. XIII/No. 2, May/June 1999.

Paula N. Rubin and Susan W. McCampbell, "The Americans With Disabilities Act and Criminal Justice: Mental Disabilities and Corrections", National Institute of Justice, United States Department of Justice, September 1995. http://www.nicic.org/Library/serial479

Paula N. Rubin and Susan W. McCampbell, The Americans With Disabilities Act and Criminal Justice: Providing Inmate Services, National Institute of Justice, United States Department of Justice, July 1994. http://www.ncjrs.org/txtfiles/amdisact.txt

Susan W. McCampbell, "ADA and Local Corrections: Implications for Personnel", The State of Corrections, Proceedings of the ACA Annual Conference, 1993, Laurel, Maryland, American Correctional Association, 1994, page 36 ff.

Susan W. McCampbell, Richard J. Koehler and David Fogell, "Arrestee and Lockup Management", Local Government Police Management, International City Management Association, Washington, D. C. 1991.

Susan W. McCampbell, "Direct Supervision: Looking for the Right People," American Jails, Vol. IV, No. 4, 1990, page 68.

**Susan W. McCampbell**
**1880 Crestview Way, Naples, Florida 34119**
**Email : susanmccampbell@cipp.org**
**Web : www.cipp.org**
**Telephone (954) 856-7913**

Updated 07 07 2022

Rule 26(a)(2)(B)(v) disclosure:

The following is a list of all cases in which, during the previous 4 years, I have testified as an expert at trial or by deposition:

1.  I testified via deposition on September 2, 2021 in the following matter:

>    Case Number 7:2019-cv-01314-LSC
>    U. S. District Court, Northern District of Alabama
>       Stacey Bridges v. J. C. Poe, Jr., et al,
>       Case Number 7:19-cv-00529
>       Megan Dunn fka Jane Doe # 4 v. J. C. Poe, Jr., et al,
>       Case No.: 7;:19-cv-01571
>       Allison Mann v. J. C. Poe, Jr., et al,
>       Case No.: 7;19-cv-01961
>       Jessica Rainer, fka Jane Doe #3 v. J. C. Poe, Jr., et al,
>       Case No.: 7;19-cv-01392
>       Charity Tessener, fka, Jane Doe # 2 v. J. C. Poe, Jr. et al
>        Case No.: 7:19-cv-01314
>       Whitley Goodson v. J. C. Poe, Jr. et al.
>       Case No.: 6:19-cv-01399

2.  Over the past <u>four</u> years, in my role as a Federal Court appointed monitor I appeared before the court and offered testimony on the following dates:

Case No. 1:13-CV-21570 CIV United States of America, Plaintiff v. Miami-Dade County; Miami-Dade County Board of County Commissioners; Miami-Dade County Public Health Trust, Defendants, United States District Court for the Southern District of Florida

- The Honorable William J. Zloch (2013 – 2018)
- The Honorable Beth Bloom (2018 – present)
- Appointed Lead Court Monitor July, 2013 - still serving.
- Status Conferences before the Court:
  - October 21, 2014 (before Judge Zloch)
  - January 27, 2015 (before Judge Zloch)
  - July 16, 2015 (before Judge Zloch)
  - April 5, 2016 (before Judge Zloch)
  - January 26, 2017 (before Judge Zloch)
  - June 21, 2018 (before Judge Bloom)
  - April 12, 2018(before Judge Bloom)
  - September 7, 2018 (before Judge Bloom)
  - February 15, 2019 (before Judge Bloom)
  - December 4, 2020 (before Judge Bloom)
  - July 16, 2021(before Judge Bloom)
  - December 10, 2021(before Judge Bloom)
  - April 15, 2022 (before Judge Bloom)

Civil Action No. 12-859 LaShawn Jones, et al. Plaintiffs v. Marlin Gusman, Sheriff, Orleans Parish, et al., United States District Court, Eastern District of Louisiana

- The Honorable Lance M. Africk
- Magistrate Judge Michael B. North
- Appointed Court Monitor August 30, 2013, served through June 2019
- Appearances before the Court (some in person, some telephonic; some status conferences, some evidentiary hearings)
  - November 19, 2013
  - December 13, 2013
  - January 30, 2014
  - February 5, 2014
  - February 26, 2014
  - March 17, 2014
  - April 17, 2014
  - April 28, 2014
  - May 28, 2014
  - May 30, 2014
  - June 10, 2014
  - June 25, 2014
  - July 25, 2014
  - July 29, 2014
  - August 28, 2014
  - October 17, 2014
  - October 31, 2014
  - December 1, 2014
  - December 17, 2014
  - January 22, 2015
  - March 26, 2015
  - April 14, 2015
  - June 9, 2015
  - June 25, 2015
  - August 6, 2015
  - August 26, 2015
  - October 2, 2015
  - October 9, 2015
  - October 22, 2015
  - November 12, 2015
  - January 29, 2016
  - February 1, 2016
  - February 2, 2016
  - March 9, 2016
  - March 21, 2016
  - April 7, 2016
  - June 6 – 9, 2016 (Evidentiary Hearing)
  - June 21, 2016
  - July 6, 2016
  - August 10, 2016
  - September 15, 2016
  - June 6, 2017
  - June 8, 2017
  - October 12, 2017
  - October 25, 2017
  - January 29, 2018
  - February 28, 2018
  - June 13, 2018
  - January 17, 2019
  - May 7, 2019